THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. |
| v. | ) ) | |
| ACTIVE NETWORK, LLC, | ) ) | |
| Defendant. | ) ) | |

## AMENDED COMPLAINT

The Consumer Financial Protection Bureau (Bureau) brings this action against ACTIVE Network, LLC (ACTIVE) alleging violations of sections 1031(a), 1036(a), and 1054(a) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531(a), 5536(a), and 5564(a); the Electronic Fund Transfer Act (EFTA), 15 U.S.C § 1693e(b); and Regulation E, 12 C.F.R. § 1005.10(d).

## INTRODUCTION

1. ACTIVE provides third-party registration and payment processing services to consumers signing up to participate in races (including many that raise funds for causes like cancer research, animal rescues, and programs for special needs children), and other events, and to the organizers of those events. But, while the consumers are signing up for these events, ACTIVE uses deceptive and abusive acts and practices to dupe them into also enrolling in ACTIVE's own discount club. Since July 2011, ACTIVE has generated over $300 million in fees from approximately three million consumers using these unlawful tactics.

1

2.     When consumers are enrolling in an event, ACTIVE inserts a webpage into the registration and payment process that includes a button, typically labeled "Accept," that, when clicked, enrolls the consumers in ACTIVE's discount club membership called "Active Advantage." Many consumers click on this highlighted button because they mistakenly believe this action is required to accept charges to their credit or debit cards for the event. Instead, consumers are actually enrolling in a trial membership in the Active Advantage discount club, which automatically converts to a paid subscription with an annual fee of $89.95, unless consumers opt out by canceling their membership within 30 days.

3.     ACTIVE has conducted real-time marketing tests and made calculated design choices in its development of this so-called "inserted offer" to manipulate consumers into enrolling without their knowledge or consent and to maximize consumer enrollment rates.

4.     ACTIVE's trial offer has a "negative option" renewal policy, which means it automatically converts to a fee-based membership that renews each year unless consumers take certain affirmative steps.

5.     Due to ACTIVE's negative option renewal policy, many consumers are then converted from a free trial into a paid membership without their knowledge, ultimately paying fees for Active Advantage memberships that are rarely wanted or used.

**JURISDICTION AND VENUE**

6.     This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

7.     Venue is proper because ACTIVE's principal place of business is in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. 28 U.S.C. § 1391(b); 12 U.S.C. § 5564(f).

**PARTIES**

8.     The Bureau is an independent agency of the United States created by the Consumer Financial Protection Act to regulate the offering and provision of consumer financial products and services under federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority and is authorized to initiate civil actions in federal district court to secure appropriate relief for violations of "Federal consumer financial law," 12 U.S.C. § 5564, which includes the authority to enforce EFTA and Regulation E. 15 U.S.C. §§ 1693*o*(a)(5).

9.     The Bureau has specific enforcement authority "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a).

10.     Defendant ACTIVE Network, LLC is incorporated in Delaware with its principal place of business at 5850 Granite Street, Suite 1200, Plano, Texas 75024.

11.     ACTIVE transacts business throughout the United States (and in some other countries).

12.     ACTIVE is a wholly owned subsidiary of Global Payments Inc., which is a large, publicly traded payments processing company incorporated in Georgia with its principal executive offices at 3550 Lenox Road, Atlanta, Georgia 30326.

13.     Global Payments purchased ACTIVE in 2017 for a reported $1.2 billion.

14.     ACTIVE, in 2019, earned about $195 million in revenue and had an equity value of approximately $1.2 billion.

15.     ACTIVE, at least since July 21, 2011, has collected consumer payments data through its software applications.

16.     ACTIVE, at least since July 21, 2011, has provided consumer payments storage services to event organizers and to those organizers' consumers.

17.     ACTIVE, at least since July 21, 2011, has provided consumer payments processing to event organizers and to those organizers' consumers.

18.     ACTIVE, at least since July 21, 2011, has transmitted consumer payments data electronically through payment systems used for processing consumer payments.

19.     ACTIVE transmits payments primarily through its parent company, Global Payments.

20.     Global Payments further processes the payments and also receives remittances that it transmits back to ACTIVE for further processing and distribution to event organizers.

21.     The typical event participant (i.e., a runner or a camper) is a "consumer" under the CFPA. 12 U.S.C. § 5481(4) and (5)(A).

22.     ACTIVE offers or provides payments processing and storage services to consumers for personal, family, or household purposes, namely to consumers sending payments for event registrations. 12 U.S.C. § 5481(4) and (5)(A).

23.     ACTIVE is a "covered person" under the CFPA because it "provid[es] payments or other financial data processing services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any

payments systems or network used for processing payments data. . . ." 12 U.S.C. § 5481(5)(A), (6)(A), and (15)(A)(vii).

24.     ACTIVE has marketed its discount club, Active Advantage, "in connection with any transaction with a consumer for a consumer financial product or service" because ACTIVE sells memberships in Active Advantage by inserting its enrollment offer in the user flow of consumers registering for events online, while storing and transmitting payments. 12 U.S.C. § 5531(a).

25.     ACTIVE is "a person" subject to the Bureau's authority to enforce EFTA and Regulation E. 15 U.S.C. § 1693o(a)(5).

26.     ACTIVE is subject to the provisions of 12 C.F.R. § 1005.10(d), among other provisions, because these provisions "appl[y] to any person, other than [certain motor vehicle dealers]." 12 C.F.R. §1005.3(a).

## FACTUAL BACKGROUND

### *ACTIVE Provides Consumer Payments Processing and Data Storage Services*

27.     ACTIVE's webpages, at least since 2019, have stated that ACTIVE has been providing "online payment processing to event organizers for over 13 years" and that ACTIVE is committed to "stor[ing], process[ing] and transmit[ting] cardholder data" securely.

28.     Event organizers contract with ACTIVE so that participants in their events can register and pay for events online.

29.     ACTIVE collects the consumers' registration information and consumer payments data (e.g., credit or debit card number) so that ACTIVE can transmit the consumer payments data through the payments systems.

30.    ACTIVE is compensated by collecting a portion of the remittances that it transmits to the event organizers.

31.    According to an ACTIVE executive, ACTIVE's fee is "to cover . . . the using of the software for the registration activity as well as to process the transaction or to send the transaction through to the processor."

### *ACTIVE Also Sells Subscriptions for Its Own Separate Product –*
### *the Active Advantage Discount Membership Club*

32.    Since at least July 21, 2011, ACTIVE has also marketed and sold Active Advantage, a discount membership club, to consumers. Its members are presented with redeemable discounts for processing fees, beer and wine tastings, sports apparel, flowers, travel, lodging, and race registrations.

33.    Between July 21, 2011 and early 2020, members who enrolled in Active Advantage via an inserted offer redeemed only $8.4 million in Active Advantage benefits compared to the $300 million in membership fees that ACTIVE collected from these members – meaning that the value of ACTIVE-provided benefits used by consumers is only 2.8 percent of the fees consumers paid.

34.    In an internal email, a senior manager of ACTIVE described the Active Advantage discount club as providing "pure profit." An ACTIVE vice president testified that "pure profit" means "the cost of goods sold was next to zero."

### *ACTIVE Inserts an Offer for Active Advantage into the Consumer's*
### *Event Enrollment Process*

35.    Event consumers search online to register for events in which they wish to participate. Consumers typically first find the event organizer's webpage and locate the specific desired event (e.g., a marathon).

6

36.     Once the consumer hits a button to register, they are transferred to ACTIVE's webpages to provide event registration information and their consumer payment data.

37.     Consumers may also directly reach ACTIVE's website through online searches for events.

38.     After providing their event registration and consumer payment information, consumers are next presented with the Active Advantage inserted offer page. Consumers are required to click one of two buttons at the bottom of the inserted offer page to complete their event registration and payment.

39.     The two buttons usually consist of a bright blue highlighted box titled "Accept" and a gray unhighlighted box titled "No thanks."

40.     Above these buttons is an advertisement for the Active Advantage discount club and then a box showing the consumer's address and billing information.

41.     Consumers are asked to confirm their email address and billing data and check a box to agree to ACTIVE's terms before clicking either the "Accept" or "No Thanks" button. These response buttons are commonly referred to as a "call to action button."

42.     A significant number of consumers click the highlighted "Accept" button and mistakenly enroll in ACTIVE's discount club. If these consumers do not cancel the membership that they mistakenly enrolled in by the end of the trial period, ACTIVE begins automatically withdrawing the annual fee from their accounts or billing their accounts for the annual fee.

43.     ACTIVE's own consumer testing of word choices for the inserted offer buttons shows that ACTIVE avoided words or phrases that more likely communicated the true nature of the transaction because those led to fewer enrollments.

44.    Specifically, ACTIVE's marketing tests between 2016 and 2019 demonstrate that an ambiguous word on the call to action button, for example, "Accept," results in significantly higher rates of consumers enrolling in Active Advantage. ACTIVE rejected words and phrases that were more likely to alert consumers that they are signing up for a new and distinct product, such as "Start Free Trial," "Enroll," and "Accept Membership." These words and phrases yielded significantly lower enrollments rates than "Accept."

45.    ACTIVE provides consumers a transaction confirmation page after they click "Accept" or "No Thanks."

46.    The confirmation page includes the event registration fee but does not list the annual fee for the Active Advantage discount club or mention the membership program in any way, even for consumers who clicked "Accept."

47.    After consumers have been enrolled in the discount club, ACTIVE sends consumers emails advertising the club, some of which have small-print instructions on how to "modify" or cancel the membership.

48.    According to ACTIVE's data, only twenty-six percent of billed consumers open these emails.

49.    As of July 2011, the annual fee for Active Advantage was $79.95. On or around January 4, 2019, ACTIVE increased the annual fee to $89.95.

50.    ACTIVE did not provide consumers written notice of the increased fee amount and the date that amount would be automatically withdrawn from consumers' accounts at least 10 days before the scheduled payment date.

*ACTIVE's Unlawful Marketing Tactics Caused Significant Harm to Consumers*

51.     A significant number of consumers have been misled into enrolling in Active Advantage through this inserted offer, evidenced by ACTIVE's own data, the high rates of consumers requesting that their credit card issuer reverse the transaction (a chargeback), and numerous consumer complaints. Many of these consumers have been unable to obtain full refunds.

52.     ACTIVE has received over $300 million in fees from more than three million consumers enrolled in Active Advantage since July 21, 2011.

53.     The inserted enrollment offer has produced about 93 percent of the fees collected for Active Advantage.

54.     At various times, ACTIVE's chargeback rate—the percentage of consumers objecting to being billed for the discount club—was exceedingly high.

55.     ACTIVE's analysis of the chargeback rate for Active Advantage shows chargeback rates of either six or seven percent for the final three months of 2019, and an ACTIVE senior finance manager noted that the chargeback rate for Active Advantage exceeded six percent in 2018.

56.     These chargeback rates exceed by several multiples the chargeback rates of 1 to 1.5% that the major credit card network rules deem concerning.

57.     Over the past decade, thousands of consumers have requested cancellations, many complaining to ACTIVE that they were unaware they were enrolled in Active Advantage.

58.     ACTIVE documented that about 72 percent of the consumers who were enrolled in Active Advantage through the inserted offer and who requested to cancel their membership in 2019 were "unaware" of their membership.

9

59.     Since July 21, 2011, those who enrolled in Active Advantage through an inserted offer have redeemed only a fraction of the alleged benefits of membership.

60.     ACTIVE's policy and practice is not to provide full refunds to consumers requesting refunds of their Active Advantage membership fees. Fees are prorated based on a few factors, including whether the consumer sought a refund before or after the end of the 30-day free trial period and whether a consumer redeemed Active Advantage benefits. The amount refunded may also depend on whether the consumer makes multiple complaints about the membership fee and insists on a refund.

61.     ACTIVE has not refunded all membership fees even where ACTIVE coded the requesting consumer as "unaware" of their memberships.

62.     ACTIVE has been the subject of enforcement actions by Iowa and Vermont for using this misleading enrollment process to sell Active Advantage. After its settlements with Iowa and Vermont, ACTIVE elected not to change its inserted offer page and instead just ceased presenting the inserted enrollment offer in those two states.

<u>COUNT I</u>
**Deceptive Act or Practice**
**ACTIVE's Misrepresentation of Inserted Offer Page and Failure to Disclose**
**Material Terms and Conditions**

63.     The allegations in Paragraphs 1-62 are incorporated herein by reference.

64.     Misrepresentation of a material fact and deceptive omission of a material fact constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

65.     In numerous instances since July 21, 2011, ACTIVE has represented, directly or indirectly, expressly or by implication, that consumers who, during and in connection with their

online event registration and payment transactions, provide information on the enrollment page for Active Advantage and click on the highlighted "Accept" call to action button were registering only for their event.

66.     In numerous instances since July 21, 2011, in which ACTIVE has made the representation set forth above, ACTIVE has failed to disclose, or disclose adequately, to consumers, that by clicking the highlighted call to action button, they are enrolling in the fee-based discount club, Active Advantage, in addition to accepting charges for their event registration payments, and that they must cancel their membership within a limited time period to avoid membership charges.

67.     By labelling the other call to action button "No Thanks," in the context of the deceptive acts and practices described in Paragraphs 65 and 66 above, ACTIVE created the false impression that consumers would be choosing to cancel the event registration rather than only rejecting the Active Advantage membership.

68.     ACTIVE's representations and omissions were likely to mislead consumers acting reasonably under the circumstances about what they were agreeing to and its cost.

69.     ACTIVE's representations and omissions were material because they were likely to affect consumers' decisions on which button to use or how to register for an event.

70.     ACTIVE's failures to disclose, or disclose adequately, the material information constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B).

## COUNT II
### Abusive Act or Practice
### ACTIVE Materially Interfered with Consumers' Understanding of Terms or Conditions

71.     The allegations in Paragraphs 1-62 are incorporated herein by reference.

72.     Under section 1031(d)(1) of the CFPA, an act or practice that "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service . . . ." is abusive and is therefore prohibited by the CFPA. 12 U.S.C. § 5531(d)(1).

73.     ACTIVE has in numerous instances since July 21, 2011, presented an Active Advantage enrollment offer to consumers during, and in connection with, their online event registration and payment transactions during which ACTIVE stores and transmits payments.

74.     ACTIVE's insertion of the Active Advantage enrollment offer page during the online registration and payment transaction, and the language it used in the offer, materially interfered with the ability of consumers to understand the terms and conditions of the Active Advantage membership.

75.     Specifically, ACTIVE interfered, at the time of the transaction, with consumers' ability to understand that by providing information on the enrollment page and clicking on the highlighted "Accept" call to action button, the consumers would be enrolled in the fee-based discount club, Active Advantage, with automatic withdrawal of a recurring annual membership fee.

76.     Therefore, the insertion of the Active Advantage enrollment offer page during consumers' event registration and payment transactions constitutes an abusive act or practice in violation of the CFPA. 12 U.S.C. §§ 5531(d)(1) and 5536(a)(1)(B).

## COUNT III
### ACTIVE's Failure to Notice Consumers of Varied Transfer Amounts

77.     The allegations in Paragraphs 1-62 are incorporated herein by reference.

78.     In numerous instances since January 4, 2019, ACTIVE increased consumers' Active Advantage membership fee and failed to "send the consumer written notice of the amount and date of the transfer at least 10 days before" initiating a transfer of an amount varying from the "amount of the previous transfer under the same authorization or from the preauthorized amount."

79.     Therefore, ACTIVE violated section 907(a) of the Electronic Funds Transfer Act (EFTA), 15 U.S.C. § 1693e(a), and section 1005.10(d) of Regulation E, 12 C.F.R. § 1005.10(d).

## COUNT IV
### ACTIVE Violated Federal Consumer Financial Law

80.     The allegations in Paragraphs 1-62 are incorporated herein by reference.

81.     Section 1036(a)(1)(A) of the CFPA prohibits covered persons from offering or providing consumer-financial products or services not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

82.     The EFTA and Regulation E are "Federal consumer financial law[s]." 12 U.S.C. §§5481(12)(C), (14).

83.     As described above, ACTIVE violated the EFTA and Regulation E while initiating transfer amounts.

84.     ACTIVE's violations constitute violations of the CFPA, 12 U.S.C. § 5536(a)(1)(A).

13

## <u>DEMAND FOR RELIEF</u>

Wherefore, the Bureau requests that the Court:

a.    permanently enjoin Defendant from committing future violations of the CFPA, 12 U.S.C. §§ 5531, 5536, or any other provision of "Federal consumer financial law" as defined by 12 U.S.C. § 5481(14);

b.    permanently enjoin Defendant from committing future violations of EFTA, 15 U.S.C. § 1693 *et seq.*, and its implementing regulation, Regulation E, 12 C.F.R. pt. 1005;

c.    award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the CFPA, EFTA, and Regulation E, including but not limited to rescission or reformation of contracts, refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages;

d.    impose a civil money penalty against Defendant;

e.    order Defendant to pay the Bureau's costs incurred in connection with prosecuting this action; and

f.    award additional relief as the Court may deem just and proper.

Dated: October 18, 2022                 Respectfully submitted,

Eric Halperin
*Enforcement Director*

Richa Shyam Dasgupta
*Deputy Enforcement Director*

14

James T. Sugarman
*Assistant Litigation Deputy*

/s/ **Uche Egemonye** *
Uche Egemonye
Senior Litigation Counsel
GA Bar No.: 242160
E-mail: Uche.Egemonye@cfpb.gov
Phone: 202-435-7349
Fax No.:  202-435-5468

Monika Moore
Senior Litigation Counsel
DC Bar No.: 500781
Email: Monika.Moore@cfpb.gov
Phone: 202-360-5905

1700 G Street, NW
Washington, D.C. 20552

*Attorneys for Plaintiff*
*Bureau of Consumer Financial Protection*

---

* Attorneys listed below this line have been approved to appear *pro hac vice*.