**UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No. 4:22-cv-00898-ALM** |
| **ACTIVE NETWORK, LLC,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT ACTIVE NETWORK, LLC'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND BRIEF IN SUPPORT**

Defendant Active Network, LLC ("Active") files this Motion to Dismiss Plaintiff's First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) and Brief in Support, and states as follows:

## I. Preliminary Statement

This lawsuit represents a classic case of agency overreach. The Consumer Financial Protection Bureau ("CFPB") seeks to expand its enforcement jurisdiction to reach Active's sale of Active Advantage (hereafter, "Advantage"), a membership program and a manifestly nonfinancial product. Active sells only event registrations and Advantage to consumers, neither of which bring Active within the CFPB's enforcement power. Put simply, Active is not a covered person as that term is used in the CFPA,[1] which means the CFPB cannot enforce the CFPA against Active. To be clear, Active does not contend that the Advantage product is immune from regulatory scrutiny. On the contrary, the CFPB's jurisdictional overreach here is simply a power grab because the

[1] All terms and abbreviations carry the same meaning as in the First Amended Complaint, ECF No. 3 ("FAC"), unless otherwise noted.

statutory authority for regulating the Advantage product was expressly delegated to a different agency—the Federal Trade Commission ("FTC"), through the Restore Online Shoppers' Confidence Act ("ROSCA"). The CFPB's brazen attempt to expand its reach beyond its statutory authorization should be rejected for the reasons set forth below.

First, the CFPB lacks enforcement authority over Active's sale of Advantage. Indeed, Active falls squarely into the merchant exception under the CFPA, which exempts from the CFPB's enforcement authority the payment activity of merchants who are selling their own products. As a result, Active is not a "covered person" as defined in the CFPA. Recognizing this fact, the CFPB has also asserted that the Advantage program falls within the agency's enforcement jurisdiction because it is offered "in connection" with financial products or services. However, the financial product referenced is, as the FAC acknowledges in passing, a software-as-a-service product provided directly to event organizers (not consumers) through an entirely different transaction that is unrelated to the Advantage program. What consumers obtain from Active is not payment processing services but event registrations. Because the CFPB lacks authority to bring this action, it is ultra vires and must be dismissed.

Second, the CFPB's claims are barred by the statute of limitations. The CFPB's CFPA claims are subject to a three-year statute of limitations, which began to accrue once the CFPB obtained actual knowledge of facts giving rise to the action or notice of the facts which in the exercise of reasonable diligence would have led to actual knowledge. The CFPB had actual knowledge of the alleged facts giving rise to this action (or at a minimum, had notice of facts that in the exercise of reasonable diligence would have led to actual knowledge) far earlier than the summer of 2019, especially given that Active publicly settled California class action lawsuits based on the Advantage program in 2016. *See* Ken Stone, *Active Network Settles Suit, Will Pay*

*Runners, Other Users*, Times of San Diego (June 16, 2016), https://timesofsandiego.com/business/2016/06/16/active-network-settles-suit-will-pay-runners-other-users/; Judgment, *Weight v. The Active Network, Inc.*, Case No. 37-2014-00004713-CU-AT-CTL (Cal. Super. Ct. Jan. 27, 2017) (approving 2016 class action settlement). The CFPB's EFTA claim (Count III) is subject to a one-year statute of limitations, which begins to accrue from the date of the occurrence of the violation, regardless of when the CFPB discovered or should have discovered the violation. As alleged by the CFPB, Active increased the price of its Advantage membership program fee, the purported EFTA violation, in January 2019—over three years before bringing this suit. Thus, the CFPB's EFTA claim is also time barred.

Third, even if the Court finds the CFPB's claims are not ultra vires or time barred, the CFPB has failed to state cognizable claims for deceptive or abusive practices under the CFPA. To support a claim for consumer deception, the CFPB is required to plead that a consumer acting reasonably would be deceived. Similarly, to support a claim for abusive conduct the CFPB is required to plausibly plead that Active took unreasonable advantage of consumers by creating confusion about whether the consumer was enrolling in the Advantage program. Contrary to Plaintiff's unadorned conclusions, the facts pleaded in the FAC demonstrate that Active clearly disclosed to consumers that they were enrolling in the Advantage program and consumers had to perform multiple actions to affirmatively indicate their decision to join the program before any consumer was enrolled. Those who accepted the terms and did not cancel during the free membership period did so willingly and knowingly. The CFPB's contrary allegations ignore the reality of how the offer was presented and are not entitled to any favorable inferences. Absent these inferences, the claims fail.

Fourth and finally, in bringing this enforcement action against Active, the CFPB relies

upon a funding mechanism that, as the Supreme Court has recently held, is constitutional only so long as the Federal Reserve recognizes a surplus to fund the CFPB. Despite the incontrovertible fact that the Federal Reserve has been operating at a deficit since 2022, the CFPB has continued to receive funding, contrary to its authorizing statute. This fact alone warrants dismissal.

## II. Statement of Issues to be Decided

1. Whether Counts I, II, and IV of the FAC must be dismissed because the CFPB lacks enforcement authority to bring CFPA claims against Active because Active, as a merchant, sells its own nonfinancial products and thus is not a "covered person" under the CFPA?

2. Whether the claims are barred by the statute of limitations because:

a. Counts I, II, and IV of the FAC are subject to a three-year statute of limitations and the CFPB had knowledge of its claims prior to 2019; and

b. Count III of the FAC is subject to a one-year statute of limitations and the CFPB bases its allegations on conduct that occurred in January of 2019?

3. Whether Counts I and II must be dismissed because the CFPB has failed to allege facts supporting an inference that Active's conduct was deceptive or abusive, where the registration process for the membership program at issue clearly discloses the terms of the program and requires three affirmative steps from the consumer to enroll?

4. Whether this case must be dismissed because the CFPB's current funding is illegal, where the CFPB must be funded out of the surplus funds generated by the Federal Reserve, but the CFPB has continued to receive operating funds while the Federal Reserve has not generated any surplus?

## III. The FAC's Allegations

Active operates a web-based platform that connects event organizers with customers and provides resources to customers and event organizers related to participation in fitness and other

recreational activities. FAC ¶¶ 1, 37-38; Active, https://www.active.com/ (last visited Jun. 12, 2024). Customers visit Active's webpage to search for events and to purchase event registrations from Active. FAC ¶¶ 37-38. In addition to connecting customers and event organizers and selling registrations, Active also sells a membership product called Advantage, which provides members discounts on merchandise, travel, and registrations. FAC ¶ 32. Most Advantage members enter the program by registering for a free trial. *See* FAC ¶ 42, 47. Once the free trial ends, members are billed annually if they choose to remain in the program. FAC ¶ 42.

The CFPB has challenged the presentation of the Advantage offer that occurs after a customer completes an event registration. FAC ¶ 38. This enrollment method begins when customers identify the event for which they wish to register on the Active.com homepage. FAC ¶ 36-38. After customers click on the green "Register now" button next to their event, they are taken to the registration page where they fill out the requested information for the event. *See* FAC ¶ 38. After clicking "CONTINUE," customers are brought to a "Review Cart and Check Out" page and then asked to fill out their payment and billing information. *See* FAC ¶ 38.[2] After clicking "COMPLETE" for their event registration, customers are brought to the "Advantage" page. *See* FAC ¶ 38. Here, Active tells customers in large, distinctive text at the top of the page

[2] *See infra*, Part IV, for screenshots of the offer presentation, which is described in the FAC at paragraphs 38-41. The court may consider screenshots from ACTIVE's webpage because they have been incorporated by reference throughout the FAC, *see, e.g.*, ¶¶ 2, 36-46, 65, 75, are central to the CFPB's claims, and are publicly accessible. *HCL Techs. Ltd. v Atos S.E.*, Case No. 3:23-cv-868, 2024 WL 1076821 (N.D. Tex. Jan. 31, 2024) (explaining that "[t]he Court should consider the press release, as it is referenced in the complaint and central to [plaintiff's] claim of copyright infringement," and also taking judicial notice of "screenshots" attached to plaintiff's opposition because they were from the party's publicly accessible website and their accuracy was not disputed by defendants); *see also Columbare v. Sw. Airlines, Co.*, No. 3:21-cv-297-B-BK, 2023 WL 406439, at *4 (N.D. Tex. Jan. 10, 2023) ("Courts have taken judicial notice of publicly available information on a company's official website." (collecting cases)).

that the consumer's registration for the event is complete. *See* FAC ¶ 38. Below that text Active provides an offer to sign up for a free 30-day trial of the Advantage program. *See* FAC ¶ 38-40.

If customers do not want to sign up, they can click the "No thanks" button or simply close the browser window or tab. No additional action is required to purchase the race registration or decline the Advantage offer. *See* FAC ¶ 39. If customers do want to sign up, they must take three separate actions to authorize enrollment in the trial: they must (1) click a checkbox stating: "I HAVE READ, UNDERSTAND, AND AGREE TO THE ACTIVE ADVANTAGE OFFER AND BILLING TERMS AND AUTHORIZE ACTIVE TO CHARGE THE ANNUAL MEMBERSHIP FEE OF $89.95 TO THE CARD LISTED BELOW ON THE TERMS DESCRIBED ABOVE UNLESS I CANCEL"; (2) verify their email address by typing it in a text box; and (3) only after clicking the checkbox and entering their email addresses, the customer click the "Accept" button. After accepting or declining to sign up for the Advantage membership, customers advance to the "Confirmation" page. *See* FAC ¶ 38-41. If a customer accepts the terms and enrolls in the Advantage program, Active sends them a welcome email that the 30-day trial has started with instructions on how to cancel. *See* FAC ¶ 47.

The FAC alleges four counts against Active: Count I alleges that Active deceptively misrepresented and omitted material facts; Count II alleges that Active "materially interfere[d] with the ability of a consumer to understand a term or condition of a consumer financial product or service"; Count III alleges a violation of EFTA and Regulation E; and Count IV alleges a violation of the CFPA based on the alleged violations of EFTA and Regulation E.

## IV. Argument and Authorities

### A. Applicable standard of review under Rule 12(b)(6).

Because the Court is well-aware of the relevant standard of review for a Rule 12(b)(6) motion to dismiss under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009), Active will not reiterate it here, other than to emphasize that the standard does not permit the Court to "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quotation marks and citation omitted).

**B. Because Active is not a covered person, the CFPB's CFPA claims are ultra vires.**

The CFPB, "like all administrative agencies, must ground its actions 'in a valid grant of authority from Congress . . . .'" *Midship Pipeline Co., L.L.C. v. FERC*, 45 F.4th 867, 870 (5th Cir. 2022) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000)). "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *Id.* at 876 (quoting *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022)).

The CFPB may bring an enforcement action to pursue CFPA claims (hereafter, "UDAAP claims") against a party "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). The CFPB alleges only that Active is a "covered person," not a "service provider." *See* FAC ¶ 23.

The CFPB further alleges that "ACTIVE has marketed its discount club, Active Advantage, 'in connection with any transaction with a consumer for a consumer financial product or service' because ACTIVE sells memberships in Advantage by inserting its enrollment offer in the user flow of consumers registering for events online, while storing and transmitting payments. 12 U.S.C. § 5531(a)." FAC ¶ 24. Under the plain language of Section 5531(a), however, the phrase "in connection with" still requires that the CFPB demonstrates that Active is a "covered person."

As demonstrated below, it cannot do so because the Advantage program is not a consumer financial product or service and Active, as a merchant selling its own nonfinancial product, is exempt from the definition of a "covered person." Thus, the CFPB lacks jurisdiction over Active, and the CFPA claims (Counts I, II, and IV) are ultra vires.

Specifically, the term "covered persons" includes: "(A) any person that engages in offering or providing a consumer financial product or service; and (B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person." 12 U.S.C. § 5481(6). For the purposes of this investigation, a "consumer financial product or service" is defined, in pertinent, part as:

> any financial product or service that is described in one or more categories under—
>
> (A) paragraph (15) and is offered or provided for use by consumers primarily for personal, family, or household purposes; or
>
> (B) clause (i), (iii), (ix), or (x) of paragraph (15)(A), and is delivered, offered, or provided in connection with a consumer financial product or service referred to in subparagraph (A).

12 U.S.C. § 5481(5). Thus, for Active to be a "covered person[]" under the CFPA, Active must "offer[] or provid[e] a consumer financial product or service," 12 U.S.C. § 5481(6)(A).

Under 12 U.S.C. § 5481(6)(A), the CFPB must demonstrate that Active "offer[s] or provid[es]" a "financial product or service that is described in one or more categories under . . . paragraph (15) . . . for use by consumers primarily for personal, family, or household purposes . . . ." 12 U.S.C. § 5481(5)(A). As an initial matter, the FAC does not allege that Active offers any products or services described in 12 U.S.C. § 5481(15)(A)(i), (iii), (ix), or (x).[3] Rather,

[3] These subparts concern "(i) extending credit and servicing loans"; "(iii) providing real estate settlement services"; "(ix) collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers; and (x) collecting debt related to any consumer financial product or service . . . ."

within subsection 15(A), the CFPB invokes only subpart (vii). Under that subpart, the term "financial product or service" means—

> . . .
>
> providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data, including payments made through an online banking system or mobile telecommunications network . . . .

12 U.S.C. § 5481(15)(A)(vii). There are no allegations, nor could there be, that either the event registrations Active sells or the Advantage program fit this definition. Rather, the CFPB hedges by alleging that Active "collected consumer payments data through its software applications," "provided consumer payments storage services to event organizers and to those organizers' consumers," and "provided consumer payments processing to event organizers and to those organizers' consumers." FAC ¶¶ 15-17. But as later allegations make clear, the payments services described in paragraphs 15-17 are not products sold to consumers, rather they are services sold to event organizers, and do not satisfy § 5481(15)(A)(vii).

Further, Congress, specifically exempted from the definition of "covered person" the very conduct on which the CFPB bases its claims when that conduct occurs as part of a merchant selling a nonfinancial product:

> [A] person shall not be deemed to be a covered person with respect to financial data processing solely because the person—
>
> > (I) is a merchant, retailer, seller of any nonfinancial good or service who engages in financial data processing by transmitting or storing payments data about a consumer exclusively for purpose of initiating payments instructions by the consumer to pay such person for the purchase of, or to complete a commercial transaction for, such nonfinancial good or service sold directly by such person to the consumer . . . .

12 U.S.C. § 5481(15)(A)(vii)(I) (hereafter, the "merchant exception").

The merchant exception definitively excludes Active from the CFPB's jurisdiction here.

Active stores financial data "exclusively for the purpose of initiating payments instructions by the consumer to pay [Active] for the purchase of, or to complete a commercial transaction for, [the registrations and/or the Advantage product] sold directly by [Active] to the consumer." 12 U.S.C. § 5481(15)(A)(vii)(I). The CFPB does not and cannot allege otherwise. Indeed, the allegations track the language of the merchant exception, while also describing Advantage as a nonfinancial good or service. *See* FAC ¶ 24 (alleging that Active is a "covered person" because Active "sells memberships in Active Advantage [to consumers] . . . while storing and transmitting payments"); *id.* ¶ 32 (explaining that the Advantage program presents members with "redeemable discounts for [event] processing fees, beer and wine tastings, sports apparel, flowers, travel, lodging, and race registrations"). Because Active is selling its own nonfinancial product, the sale of the Advantage product falls within the merchant exception. Permitting the CFPB's expansive interpretation of its authority to include the Advantage product would eviscerate the merchant exception, leading to a result where any merchant—from grocery stores to barbershops—could be regulated by the CFPB simply because the merchant accepts payment for goods and services. That is not what the statute permits.

Nor is it what Congress intended. When Congress enacted the CFPA and placed it within the broader schema of federal consumer protection laws, Congress granted the responsibility for regulating negative option programs, such as Advantage, explicitly to the FTC and state attorneys general under ROSCA. 15 U.S.C. §§ 8401(8) (noting Congressional findings regarding use of negative option sales; 8403 ("Negative Option Marketing on the Internet"); 8404 ("Enforcement by Federal Trade Commission"). As the FTC has explained, ROSCA was enacted "to address ongoing problems with online negative option marketing" and is the "only law primarily designed to do so." Notice of Proposed Rulemaking: Use of Prenotification Negative Option Plans, 88 Fed.

Reg. 24716, 24717-18 (proposed Apr. 24, 2023). Congress's intent to grant the FTC regulatory authority over negative options is further evident from the timing of ROSCA's enactment, which was five months *after* it enacted the CFPA. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. Law 111-203, 124 Stat. 1376 (July 21, 2010); Restore Online Shoppers' Confidence Act, Pub. Law 111-345, 124 Stat. 3618 (Dec. 29, 2010); *see United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (holding that the later-in-time statute which was more specific and which provisions were more comprehensive governed over the older general statute).

The CFPB is attempting to needlessly expand its oversight and shoehorn a ROSCA disclosure claim into a CFPA UDAAP claim under the CFPA through misleading and conclusory assertions, but that cannot change the statutes. ROSCA's later-in-time and express language governing negative options plans reveals that the FTC and ROSCA—not the CFPB and its reliance on the CFPA's general provisions—have jurisdiction over the Advantage program. *W. Virginia*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001))); *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety and Health Admin.*, 595 U.S. 109 (2022) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."); *Midship Pipeline Co., LLC*, 45 F.4th at 876 (finding FERC's interpretation expanding its powers to dictate remediation costs or order damages under the Natural Gas Act impermissibly "change[d] the plot line" of its authorizing statute (citation omitted)).[4] The Court should reject this wholesale attempt to expand

[4] The impropriety of the CFPB's enforcement overreach is not just an academic question. By adopting an expansive theory of its jurisdiction to include a product that is already under the jurisdiction of another agency's enforcement power, the CFPB has created a scenario where the two agencies could make conflicting determinations about how an offer can be presented.

the CFPB's authority to cover virtually any product sold to consumers and leave the oversight of the Advantage product where Congress expressly designated it—with the FTC.

Recognizing that it lacks enforcement authority over the Advantage product, the CFPB turns to Active's sale of event registrations. However, Active's sale of event registration is also subject to the merchant exception. Active sells event registrations on its website on behalf of event organizers to event participants. Per the FAC, consumers can either find events on the event websites, which direct the consumer to Active's website, where the registrations are available for purchase, or by searching Active's website directly. FAC ¶ 36-37. Pursuant to its contractual agreements with event owners, each owner must honor all event registrations that Active sells and allow the customer to participate in the advertised event. FAC ¶ 28; *see also* Product and Services General Terms, https://info.activenetwork.com/general-terms (last visited Jun. 12, 2024); Endurance, Sports, and Ticketing Product Attachment, https://info.activenetwork.com/sports-terms (last visited Jun. 12, 2024).[5] As the FAC alleges, Active is compensated for the sale of the event registration, "to cover . . . the using of the software for registration activity as well as to process the transaction or to send the transaction through to the processor." FAC ¶¶ 30-31.[6]
By its own language in the FAC, the CFPB admits that Active sells consumers event registrations, which are not financial products. *Cf.* 12 U.S.C. § 5481(5). That Active is compensated for the sale (including for overhead necessary to complete the sale) does not change this conclusion.

---

[5] The Court may consider Active's online terms on a motion to dismiss because the CFPB has referenced them in the FAC. *See Huawei Techs. USA, Inc. v. United States*, 440 F. Supp. 3d 607, 627 (E.D. Tex. 2020) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

[6] The quotation included in the FAC is incomplete and without citation. The quote comes from the investigative hearing of Dave Stevenson, conducted on March 5, 2021. The full quotation would read: "It's to cover the utilization of the software, which includes the using of the software for the registration activity as well as to process the transaction or to send the transaction through to the processor."

Having failed to identify any consumer financial product that it is authorized to regulate, the CFPB attempts to circumvent the merchant exemption by linking (albeit vaguely) the alleged wrongful conduct—the sale of the Advantage product to consumers—to an entirely *different* product—event management software—that Active sells to *different* entities, namely event organizers, which are businesses, not consumers. The CFPB's attempt intentionally conflates Active's Advantage membership product sold directly to consumers with Active's event management software sold to *event organizers* for their business purposes.

As referenced in the FAC, Active offers event management software, Endurance, to event organizers, not consumers. Endurance helps event organizers to manage their event business by allowing organizers to track and register participants, track times for events, manage data from events, market events, and provide access to payment technology solutions. FAC ¶¶ 27-31; Active Network, *ACTIVEWorks Endurance*, https://www.activenetwork.com/activeworks-endurance (last visited June 14, 2024); Active Network, *Software Features Designed for You*, https://info.activenetwork.com/features (last visited Jun. 14, 2024).[7] By contrast, Active's Advantage product is a membership offered to consumers that provides exclusive discounts on merchandise, travel, lodging, and event registrations. FAC ¶ 32.

Although the CFPB refers throughout the FAC to Active's payment processing services, paragraph 27 of its FAC concedes that Active provides those payment processing services "<u>to event organizers</u>," not to consumers for personal, family, or household purposes. FAC ¶ 27 ("ACTIVE has been providing 'online payment processing to event organizers for over 13 years'"). Although presented without attribution, the CFPB draws the quoted language in

[7] The Court may take judicial notice of a company's publicly available website when ruling on a motion to dismiss. *See supra* note 2.

paragraph 27 from Active's "Online Payment Processing" webpage, which explains that Active's "payment processing features makes money management safe, easy and convenient . . . for your business . . . ." *See* Active Network, *Online Payment Processing* (emphasis added), https://info.activenetwork.com/features/online-payment-processing (last visited Jun. 12, 2024). The webpage then explains the various event management software tools that Active offers to event organizers. *Id.* The paragraphs of the FAC that follow make clear that Active was compensated for these services pursuant to a contract with event organizers, not with the consumers. FAC ¶¶ 28, 30. Moreover, the CFPB does not and cannot allege that the Advantage program is offered to consumers "in connection with," 12 U.S.C. § 5531(a), Active's payment processing services to event organizers, because it is not.

Accordingly, the CFPB has failed to allege any facts that would support the agency's assertion of enforcement jurisdiction over Active.

**C. The CFPB's claims are barred by the statute of limitations.**

**i. The CFPB's UDAAP claims are subject to a three-year statute of limitations.**

"[A] statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 758 (5th Cir. 2015); *Whiddon v. Chase Home Fin., LLC*, 666 F. Supp. 2d 681, 686 (E.D. Tex. 2009). CFPA UDAAP claims are subject to a three-year statute of limitations. *See* 12 U.S.C. § 5564(g)(1). Specifically, the time limit for the CFPB to bring an action for an alleged UDAAP violation of the CFPA is three years after the CFPB "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, No. 15-cv-5211 (CM), 2016 U.S. Dist. LEXIS

177756, at *58 (S.D.N.Y. Dec. 2, 2016) ("The CFPA provides that, for UDAAP claims, no action may be brought under this title more than 3 years after the date of discovery of the violation to which an action relates." (internal citation omitted)).

Here, the CFPB had actual knowledge of the alleged facts giving rise to this action far earlier than the summer of 2019. But even if the Court finds the CFPB did not have actual knowledge, the CFPB certainly had notice of facts, which, in the exercise of reasonable diligence, would have led to actual knowledge.[8]

The CFPB would have known of the facts that provide the basis for this action prior to the summer of 2019 had it acted with reasonable diligence because of Active's prior public settlement regarding the Advantage program. In 2013, a class action lawsuit was brought in California relating to the presentation of the Advantage product. This class action resulted in a public settlement in 2016, with widely available media reports and other public information. *See, e.g.*, Ken Stone, *Active Network Settles Suit, Will Pay Runners, Other Users*, Times of San Diego (Jun. 16, 2016), https://timesofsandiego.com/business/2016/06/16/active-network-settles-suit-will-pay-runners-other-users/. Where "a credible and specific consumer complaint" can "serve as a storm warning and put the CFPB on inquiry notice that it should begin investigating," *cf. Consumer Fin. Prot. Bureau v. Manseth*, No. 22-cv-29, 2023 WL 5400235, at *18 (W.D.N.Y. Aug. 22, 2023), a public settlement in 2016 regarding the same Advantage program certainly provided the CFPB with information, that, if it acted with reasonable diligence, would have resulted in knowledge of facts providing the basis of this action. *See In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979) (noting the filing of similar lawsuits against the same defendant may suffice to give

[8] As an initial matter, any CFPB employee can be the "discoverer" for statute of limitations purposes. Section 5564(g)(1) clearly does not mention a particular CFPB employee as needing to be the "discoverer" for statute of limitations purposes.

notice of possible claims).

**ii. The CFPB's EFTA claim is subject to a one-year statute of limitations.**

Claims arising under EFTA are subject to a more restrictive one-year statute of limitations. 15 U.S.C. § 1693m(g) ("Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."). Moreover, unlike the CFPA, EFTA's statute of limitations runs from the "date of the occurrence of the violation," *not* the date on which a reasonably diligent plaintiff would have discovered the violation. *See also Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009) (holding "the one-year limitations period began when the first recurring transfer took place . . . ."). As alleged in the FAC, Active increased the price of the Advantage membership program fee in January 2019—over three years before the filing of the complaint. FAC ¶ 49. Thus, the sole basis for the CFPB's EFTA claim occurred outside the applicable statute of limitations and the claim is time-barred. *CFPB v. ITT Educational Servs., Inc.*, 219 F. Supp. 3d 878, 922-23 (S.D. Ind. 2015).

**D. The CFPB has failed to state a claim under Counts I and II because Active's conduct was not deceptive or abusive under the CFPA.**

The CFPB's UDAAP claims under Counts I and II allege that Active's offer page inadequately discloses that, by clicking "Accept," consumers are enrolling in the Advantage program and will incur membership charges, and that Active provides the impression that accepting Advantage is a necessary step in event registration. These claims must be dismissed because no *reasonable* consumer would interpret Active's clear disclaimers in this manner. Only "deceptive" or "abusive" conduct that "is likely to mislead consumers acting reasonably under the circumstances" offends the CFPA or its analogous Federal Trade Commission Act provisions. *See Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (quoting *FTC v.*

*Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) and citing 12 U.S.C. § 5536(a)(1)(B)); *see also Cmty. Fin. Servs. Assn. of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 627-28 (5th 2022), *rev'd and remanded on other grounds*, 601 U.S. 416 (2024) (joining "sister circuits' interpretations of 'reasonably avoidable' from the analogous standard in the Federal Trade Commission Act").

This is an objective inquiry; the CFPB must adequately plead that Active's presentation of the Advantage offer would mislead a reasonable consumer—not the most hapless or inattentive internet user. *Gordon*, 819 F.3d at 1192; *Consumer Fin. Prot. Bureau v. Nationwide Biweekly Admin., Inc.*, No. 15-cv-02106-RS, 2017 U.S. Dist. LEXIS 145923, at *9 (N.D. Cal. Sept. 8, 2017) ("The concept that 'deception' requires something that misleads more than only the most gullible or inattentive is already embedded in the borrowed FTC definition—'likely to mislead consumers acting reasonably under the circumstances.'" (quoting *Gordon*, 819 F.3d at 1192)); *cf. Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013) (explaining that when considering the likelihood of consumer confusion, "the focus is on the typical buyer exercising ordinary caution,' not 'the most obtuse consumer" (quotation marks and citation omitted)). The CFPB has not met this standard; the allegations in the Complaint describe what, in reality, is a fulsome set of disclosures that would prevent reasonable consumers from unintentionally enrolling in Advantage.

Remarkably, in a case about inadequate disclosures and deception, the FAC does not provide the actual disclosures consumers see; instead, the CFPB refers to and characterizes the offer's presentation, a tacit acknowledgement that the actual disclosures undermine the entire basis of the agency's claims. However, because the disclosures are referenced in the FAC (¶¶ 38-41),

they may be considered on a motion to dismiss. *See supra* note 5. When the disclosures are actually viewed, it is apparent there is no deception or unfairness.

As outlined above, the Advantage offer is presented with extensive disclosures after the consumer completes registration, on a new browser page, and with a bolded heading that states "**Your Registration is Complete**" followed by "**Join ACTIVE Advantage and save today!**"[9]




Prior to signing up for the free trial, consumers are presented with a clear and conspicuous disclosure of all material terms as required by ROSCA, as depicted below. *See* 15 U.S.C. § 8403.

[9] A static version of the offer is available on Active's website. ACTIVE Advantage Registration, https://support.activenetwork.com/camps/articles/en_US/Article/Active-Advantage-Registration (last visited Jun. 17, 2024).

**ACTIVE ADVANTAGE MEMBERSHIP OFFER AND BILLING DETAILS:**

Your Active Advantage Trial Membership is free for 30 days. At the end of the 30-day trial period, and every year thereafter, unless you cancel, we will automatically renew your membership for a full year at the then current membership fee (currently $99.95) which we will automatically charge to the same credit card listed below that you provided to us for your Active.com event registration. You can cancel at any time by contacting us at ActiveAdvantage@active.com and receive a pro rata refund of the annual membership fee. Click here for Further Offer Details and rebate instructions. Offer not available in Iowa and Vermont. Member benefits may be added, removed, or changed at any time. Please see the Advantage website for the current list of live benefits.

**BY CHECKING THE BOX BELOW I UNDERSTAND AND AGREE TO THE OFFER AND BILLING DETAILS ABOVE AND AUTHORIZE ACTIVE TO CHARGE MY CREDIT CARD LISTED BELOW FOR THE ANNUAL MEMBERSHIP FEE OF $99.95 AFTER THE 30-DAY TRIAL PERIOD AND EACH YEAR AFTER THAT AT THE THEN-CURRENT ANNUAL ACTIVE ADVANTAGE MEMBERSHIP FEE UNLESS I CANCEL.**

By clicking the accept button and providing my email address below, I understand and agree to the Active Advantage Terms of Use and Privacy Policy.

By accepting the trial offer you consent to receiving membership communications. You may unsubscribe from these communications at any time.

Active Advantage Membership Billing

**Why am I verifying my credit card info?**

Unless you cancel prior to the end of the 30 day free trial period, we will automatically extend your member benefits for a full year from the end of the trial period for $99.95, which we will automatically charge to the same credit card listed below. Thereafter, unless canceled, your membership automatically renews for 1-year periods at the then-current membership fee, which we will automatically charge at the beginning of each new membership year to the same credit card.

**Membership for :** [redacted]

☐ I HAVE READ, UNDERSTAND, AND AGREE TO THE ACTIVE ADVANTAGE OFFER AND BILLING TERMS AND AUTHORIZE ACTIVE TO CHARGE THE ANNUAL MEMBERSHIP FEE OF $99.95 TO THE CARD LISTED BELOW ON THE TERMS DESCRIBED ABOVE UNLESS I CANCEL.

**Payment type :** [redacted]

**Email address :**

**Verify your email address :**

Accept | No thanks

ACTIVE Advantage is wholly run and administered by Active Network, LLC.

717 N. Harwood Street, Suite 2500 Dallas, Texas 75201 · 866-561-0647

This disclosure clearly indicates that a "Membership Offer" is being proffered; that the membership is free for 30 days; and that after the trial period, "we will automatically renew your membership for a full year at the current membership fee." The disclosures ask the consumer to verify the credit card that will be charged for the annual membership fee. With these notices, CFPB's allegation that Active "failed to disclose, or disclose adequately, to consumers, that . . . they are enrolling" is untenable. *See, e.g.*, FAC. ¶ 66.

After these disclosures are presented, consumers must then click a box that indicates they accept and consent to the terms and then affirmatively enter their email address. The consumer may only click the "Accept" call to action button after taking these two actions. If the user fails to click the box or enter their email, they are presented with error messages in red font:



Active Advantage Membership Billing

**Why am I verifying my credit card info?**

Unless you cancel prior to the end of the 30 day free trial period, we will automatically extend your member benefits for a full year from the end of the trial period for $99.95, which we will automatically charge to the same credit card listed below. Thereafter, unless canceled, your membership automatically renews for 1-year periods at the then-current membership fee, which we will automatically charge at the beginning of each new membership year to the same credit card.

**Membership for :** [redacted]

☐ I HAVE READ, UNDERSTAND, AND AGREE TO THE ACTIVE ADVANTAGE OFFER AND BILLING TERMS AND AUTHORIZE ACTIVE TO CHARGE THE ANNUAL MEMBERSHIP FEE OF $99.95 TO THE CARD LISTED BELOW ON THE TERMS DESCRIBED ABOVE UNLESS I CANCEL.

To accept the 30 day trial offer you must acknowledge your acceptance by checking this box. To decline the 30 day trial please click the No thanks button.

**Payment type :** [redacted]

**Email address :**

**Verify your email address :**

Verification email address must match the original email address.

Accept | No thanks

ACTIVE Advantage is wholly run and administered by Active Network, LLC.

717 N. Harwood Street, Suite 2500 Dallas, Texas 75201 * 866-561-0647

These disclosures, made in close proximity to the call to action button, are not deceptive as a matter of law. *Compare In re Vistaprint Corp. Marketing and Sales Practices Litigation*, MDL No. 4:08-md-1994, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009) (holding that the fact that the terms were "provided on the same webpage in close proximity to the location where the consumer indicates his agreement" demonstrated the presentation was not deceptive); *Heinz v. Amazon.com, Inc.*, 2023 WL 4466904, at *2 (E.D. Cal. July 11, 2023) (holding that the terms were "conspicuous" where they were "contained in language directly below" action buttons); *Walkingeagle v. Google, LLC*, Case No. 3:22-cv-00763-MO, 2023 WL 3981334, at *4 (D. Or. June 12, 2023) (dismissing claims where "both checkout pages contain the offer terms").

Similarly, the Advantage offer is not abusive because Active did not take unreasonable advantage of any consumer by creating confusion about whether the consumer was enrolling in

the Advantage program. *See Intercept Corp.*, No. 3:16-cv-144, 2017 WL 3774379, at *4 (dismissing the CFPB's claim under the CFPA for failing to allege facts sufficient to support a finding that the defendant "interfered with consumers' ability to understand the terms of their dealings . . . or that would support a finding that [the defendant] took unlawful advantage of consumers."). Again, as demonstrated above, Active clearly disclosed to consumers that they were enrolling in the Advantage program and the consumer had to perform multiple actions to affirmatively indicate their decision to join the program before any consumer was charged for enrollment.

Undeterred by the presentation of the offer, the FAC alleges that,

> ACTIVE's marketing tests between 2016 and 2019 demonstrate that an ambiguous word on the call to action button, for example, 'Accept,' results in significantly higher rates of consumers enrolling in Advantage. ACTIVE rejected words and phrases that were more likely to alert consumers that they were signing up for a new and distinct product, such as 'Start Free Trial,' 'Enroll,' and 'Accept Membership.' These words and phrases yielded significantly lower enrollments rates than 'Accept.'

FAC ¶ 44. The CFPB's conclusion that certain words "were more likely to alert consumers" is total conjecture. Moreover, optimizing an advertisement to appeal to customers is marketing not deception, particularly when the advertisement contains robust disclosures, as is the case here. *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 123 (2d Cir. 2018) (holding that specific words, phrases, or particular statements, on their own without considering them in the full context, are not deceptive); *Berry v. Webloyalty.com, Inc.*, No. 10-CV-1358-H CAB, 2011 WL 1375665, at *7 (S.D. Cal. Apr. 11, 2011) ("The Court concludes that Plaintiff Berry's entry of his email address twice and clicking on "YES" constitutes authorization given the various disclosures made on the enrollment page."), *vacated and remanded on other grounds*, 517 F. App'x 581 (9th Cir. 2013); *Baxter v. Intelius, Inc.*, No. SACV09-1031 AG MLGX, 2010 WL 3791487, at *4 (C.D. Cal. Sept.

16, 2010) (holding that an interstitial offer for a membership program was not deceptive because "[t]he interstitial webpage requires that the customer take affirmative steps to accept and provides complete information about the results of those steps").

**E. The CFPB's funding is contrary to law.**

Although the CFPB's claims fail as a matter of law, this action should also be dismissed because the CFPB is currently operating using funding that the agency obtained contrary to statute, Supreme Court precedent, and the Constitution. As a result, this enforcement action is ultra vires and unconstitutional.

Pursuant to its authorizing statute, the CFPB is to be funded by "draw[ing] from the Federal Reserve System the amount its Director deems 'reasonably necessary to carry out' the Bureau's duties, subject only to an inflation-adjusted cap." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024) (quoting 124 Stat. 1975, 12 U.S.C. §§ 5497(a)(1), (2)). Specifically, "[e]ach year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, the Board of Governors [of the Federal Reserve] shall transfer to the Bureau from the combined *earnings* of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau . . . ."). 12 U.S.C. § 5497(a)(1) (emphasis added). Absent the transfer to the CFPB, the Federal Reserve would otherwise remit earnings, *i.e.*, its excess funds, to the Treasury. 12 U.S.C. § 289(a)(3)(B).

In recently upholding the CFPB's novel funding mechanism as constitutional, the Supreme Court began from the undisputable premise that the transferred funds "from the combined earnings of the Federal Reserve System" are surplus funds that would otherwise be remitted to the Treasury. *Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. at 425 (finding that CFPB funding is subject to the requirements of the Appropriations Clause because "surplus funds in the Federal Reserve System would otherwise be deposited into the general fund of the Treasury. Whatever the scope of the

term 'Treasury' in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies." (citations omitted) (citing 12 U.S.C. § 5497(a)(1) and § 289(a)(3)(B))).

Since the fall of 2022, however, the Federal Reserve's expenses have exceeded its income. There is no surplus out of which funds could be remitted to the Treasury or the CFPB can be funded. *See* Federal Reserve, *Federal Reserve Board releases annual audited financial statements* (March 24, 2023), https://www.federalreserve.gov/newsevents/pressreleases/other20230324a.htm ("During 2022, the Reserve Banks transferred $76.0 billion from weekly earnings as compared to $109 billion in 2021, and in the fall, they first suspended weekly remittances to the Treasury and began accumulating a deferred asset, which totaled $16.6 billion by the end of the year.").[10]

The lack of surplus funds and corresponding accumulation of the deferred asset continued into 2023, which saw the deferred asset "increase[] by 116.7 billion resulting in a cumulative deferred asset at year-end of $133.3 billion." *See* Federal Reserve, *Federal Reserve Board releases annual audited financial statements* (March 26, 2024), https://www.federalreserve.gov/newsevents/pressreleases/other20240326a.htm. Remittances to the Treasury will not resume until the Federal Reserve banks' net excess earnings exceed $133.3 billion, *id.*, which the Federal Reserve Bank of St. Louis predicted would not occur until mid-2027. Federal Reserve Bank of St. Louis, *The Fed's Remittances to the Treasury: Explaining the 'Deferred Asset'* (Nov. 21, 2023), https://www.stlouisfed.org/on-the-economy/2023/nov/fed-remittances-treasury-explaining-deferred-asset. Despite these shortfalls, the CFPB has continued to receive transfers from the Federal Reserve Board. *See, e.g.*, Federal Reserve, *Federal Reserve Board announces preliminary*

[10] When ruling on a 12(b)(6) motion, the Court "can also consider government documents and similar matters of public record without converting the motion into one seeking summary judgment." *See Arceneaux v. Klein Indep. Sch. Dist.*, No. CV H-17-3234, 2018 WL 3496737, at *2 (S.D. Tex. July 20, 2018) (citing *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011)).

*financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024), https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm (reporting that in 2023 the Reserve Banks were assessed "$0.7 billion to fund the operations of the Consumer Financial Protection Bureau"); Federal Reserve, *Federal Reserve Board announces Reserve Bank income and expense data and transfers to the Treasury for 2022* (Jan. 13, 2023), https://www.federalreserve.gov/newsevents/pressreleases/other20230113a.htm (same for 2022).

Thus, the operating funds the CFPB has obtained since the fall of 2022 (and the funds the agency will obtain until likely 2027) contravene the agency's authorizing statute and the mechanism that the Supreme Court has held conforms to the Appropriations Clause. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1342, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority." (citing *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 416 (1990); *Dep't of the Air Force v. FLRA*, 648 F.3d 841, 845 (D.C. Cir. 2011))). The CFPB therefore brings and prosecutes this enforcement action using funds obtained in contravention of its clear constitutional authorization. *Richmond*, 496 U.S. at 424-25 ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned. Any other course would give to the fiscal officers a most dangerous discretion."). This case must be dismissed.

## V. CONCLUSION

For these reasons, the Court should grant this Motion. Further, because the CFPB already took fulsome pre-complaint discovery in this matter, the dismissal should be with prejudice.

Dated: June 17, 2024

Respectfully submitted,

*/s/ Clayton E. Bailey*
Clayton E. Bailey
Texas State Bar No. 00796151
cbailey@baileybrauer.com

**BAILEY BRAUER PLLC**
8350 N. Central Expressway, Ste. 650
Dallas, Texas 75206
Telephone: (214) 360-7433
Facsimile: (214) 360-7435

**VENABLE LLP**

Leonard L. Gordon (*pro hac vice*)
151 W 42nd Street
New York, New York 10036
(212) 307-5500
LLGordon@Venable.com

Benjamin E. Horowitz (*pro hac vice*)
600 Massachusetts Avenue NW
Washington, DC 20001
BEHorowitz@Venable.com

Elizabeth C. Rinehart (*pro hac vice*) 750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400
ECRinehart@Venable.com

*Counsel for Defendant Active Network, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2024, a copy of the foregoing was served on all parties through the Court's electronic filing system.

*/s/ Clayton Bailey*