UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>     Plaintiff,<br><br>v.<br><br>ACTIVE NETWORK, LLC,<br><br>     Defendant. | Case No. 4:22-cv-00898-ALM |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Consumer Financial Protection Bureau ("Bureau") requests that this Court deny Defendant Active Network, LLC's ("Active's") Motion to Dismiss the Bureau's Complaint,[1] Dkt. 28.

### I. Introduction

Active moves to dismiss the Bureau's Complaint by mischaracterizing the Complaint's allegations, misapplying the relevant statutes of limitations, and misreading the law governing the Bureau's funding mechanism. None of Active's arguments hold water, and the Court should deny its motion.

While acting as a third-party payment processor for charity races, summer camps, and similar community events, using deceptive and abusive acts and practices, Active inserts an offer for its Active Advantage discount club into consumers' online registration process. First Amended Complaint ¶¶ 1–5, Dkt. 3 ("FAC"). As a result, many consumers are charged for a

---

[1] For the sake of simplicity, the Bureau refers to its First Amended Complaint throughout the text of this brief simply as the "Complaint." Citations are to the "FAC."

product they were duped into purchasing. *Id*. The Advantage membership is a "negative option" renewal product, which means it automatically renews unless consumers affirmatively cancel. FAC ¶ 4. During the Bureau's investigation, it learned that the recurring subscription is so valuable to Active—generating $300 million from 2011 to early 2020—that one Active executive referred to it as "pure profit." FAC ¶¶ 33–34.

Not thwarted by multiple state enforcement actions, thousands of complaints from its own customers, private class actions, or a shareholder lawsuit, Active insists on continuing its conduct. FAC ¶¶ 57, 62; Dkt. 28 at 2–3; Am. Compl., ECF No. 39, *Shafer v. Global Payments Inc.*, 1:23-cv-00577-LMM (N.D. Ga. June 26, 2023). The Bureau seeks in this suit to provide nationwide accountability, reform, and remediation for Active's conduct.

## II. Legal Standard

As the Fifth Circuit has stated, "A motion to dismiss under rule 12(b)(6) is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (internal quotation omitted); *see also TQ Delta, LLC v. CommScope Holding Co., Inc.*, No. 2:21-CV-00310-JRG, 2022 WL 2328746, at *1 (E.D. Tex. June 28, 2022). This is because a plaintiff is required only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation omitted). To meet the Rule 8 standard and survive a motion to dismiss, a complaint need not contain detailed factual allegations, but "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the facts allow "the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. All well-pleaded factual allegations in the complaint must be accepted as true. *Masel v. Villareal*, 924 F.3d 734, 743 (5th Cir. 2019). In short, "the question . . . is whether in the light most favorable to the plaintiff and with every doubt resolved on his behalf, the complaint states any valid claim for relief." *Harrington*, 563 F.3d at 147 (internal quotation omitted).

### III. Argument

**A.    The Complaint sufficiently alleges plausible claims for relief.**

All that is required at this stage of litigation is for the Bureau to allege sufficient facts to state a claim for relief that is plausible on its face. *See Twombly*, 550 U.S. at 570. Active's motion ignores the legal standard, which requires adherence to the facts stated in the Complaint. Instead, Active repeatedly disputes the facts alleged. Active claims it is not a "covered person" under the Consumer Financial Protection Act ("CFPA"), contesting the Complaint's allegations regarding the way it operates. Active also disputes the Complaint's allegations that a "reasonable" consumer could have been duped into inadvertently enrolling in Active Advantage.

But the manner in which Active operates its business and the reasonableness of consumers' conduct are *factual* matters to be resolved at a later stage of litigation, not on a motion to dismiss. *See Hinojosa v. Livingston*, 807 F.3d 657, 668 (5th Cir. 2015) (factual disputes raised by defendants in motion to dismiss are inappropriate for resolution at that stage); *Khan v. Walmart, Inc.*, --- F.4th ---, No. 23-1751, 2024 WL 3282097, at *4 (7th Cir. July 3, 2024) ("[R]easonable consumer behaviors are matters of fact, subject to proof that can be tested at trial . . . .") (internal quotation omitted). As this Court has warned, Rule 12(b)(6) "is not a procedure for resolving contests about the facts or the merits of a case." *Games People Play, Inc. v. Nike, Inc.*, No. 1:14-CV-321, 2015 WL 13657672, at *2 (E.D. Tex. Feb. 13, 2015). Yet this is

precisely how Active uses its motion, repeatedly inserting facts that are wholly unsupported (or even contradicted) by the allegations in the Complaint, and asking this Court to simply accept Active's word for how its business operates.

This Court should reject Active's improper attempt to introduce factual disputes at this stage. The Complaint gives Active fair notice of the Bureau's claims and plausibly alleges facts that support those claims. That Active disagrees with the Bureau's factual allegations is no justification to dismiss the Complaint.[2]

### 1. The Complaint sufficiently alleges that Active is a covered person under the CFPA.

The Complaint plainly and plausibly alleges that Active is a "covered person" within the meaning of the CFPA by alleging facts sufficient to show (1) that Active engages in the offering or providing of a consumer financial product or service (here, payments processing) and (2) that Active does not qualify for the "merchant exception" to the CFPA. In arguing that it is not and could not be a covered person, Active seeks to recharacterize its business away from the allegations of the Complaint: Active repeatedly claims that it does not process consumers' payments to register for events but instead "sells" consumers "event registrations." Dkt. 28 at 1–2, 5, 9, 12–13. But the question before the Court is not how to characterize Active's business. It is whether, presuming all facts as true and drawing all inferences in the Bureau's favor, the

---

[2] This is also why Active's argument about which regulator is the "right" one to bring a claim is entirely misplaced. Dkt. 28 at 1–2, 10–12. Whether another regulator could theoretically bring a claim against Active under a different statute has no bearing on the only issue relevant to the motion to dismiss here: whether the Complaint pleads sufficient facts, accepted as true and drawing all inferences in the Bureau's favor, to state a claim for relief that is plausible on its face. The answer to that question is yes.

Complaint plausibly alleges that Active is a covered person. The Bureau's Complaint plainly does so.

### a. The Complaint alleges facts sufficient to show that Active provides payments processing services to consumers.

A "covered person" under the CFPA is one that "engages in offering or providing a consumer financial product or service . . . ." 12 U.S.C. § 5481(6). The term "consumer financial product or service" is defined by statute and includes multiple enumerated financial products or services that are "offered or provided for use by consumers primarily for personal, family, or household purposes." *Id.* § 5481(5). Among the list of financial services that are expressly included is payments processing—specifically, "providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data . . . ." *Id.* § 5481(15)(A)(vii). Thus, anyone who engages in the "offer[ing] or provid[ing]" of payments processing services to consumers via any technological means is a "covered person."

The Complaint makes detailed allegations that Active is a payments processor and thus a covered person. The Complaint describes how Active collects consumer payments data, stores that financial data for the consumers' payment instrument (a credit or debit card), transmits the data electronically, and processes payments for the benefit of event organizers and their customers. FAC ¶¶ 1–2, 15–24, 27–31, 36, 38. The Complaint also alleges that Active offers or provides payments processing and storage services to consumers "for personal, family, or household purposes, namely to consumers sending payments for event registrations." FAC ¶ 22. It states that Active's own website has referred to Active as providing "online *payment processing*" and that Active is committed to "stor[ing], process[ing] and transmit[ting]

[consumers'] cardholder data" securely. FAC ¶ 27 (quoting Active's webpages; emphasis added). It even quotes an Active executive who acknowledged that Active processes payments in connection with event registration transactions. FAC ¶ 31.[3] These allegations are more than sufficient to plausibly show that Active engages in providing payments processing services to consumers and is therefore a covered person.

Active argues that it does not provide payments processing services to consumers because these services are instead "services sold to event organizers." Dkt. 28 at 9. But the CFPA does not require that the consumer financial product or service be *sold* directly to consumers—only that the product or service be *offered* or *provided* for use by consumers. 12 U.S.C. § 5481(5)(A). The same is true under the specific payments processing provision applicable here. *Id.* § 5481(15)(A)(vii) (consumer financial product or service includes "*providing* payments . . . processing . . . services to a consumer") (emphasis added). When Active transmits credit card and debit requests that were authorized by consumers, it "provides" to consumers the service of convenient and fast payment processing, regardless of the third-party arrangements Active has with the event organizers. Active seeks to rewrite the statutory text to say that payments processors are covered persons only if they sell their services directly to consumers. But that is not what the statute says.[4]

---

[3] Active complains that this quote was "incomplete" because the Complaint elided seven words that do not alter the substance of what was said. Dkt. 28 at 12 n.6.

[4] Courts have recognized the broad definition of the term "provide" in other contexts and conclude that it simply means to "furnish" or "make available." *See, e.g.*, *United States v. Manamela*, 612 F. App'x 151, 156 (3d Cir. 2015) (noting the "expansive[]" dictionary definition of the word "provide" and concluding that "provide" simply means to "make available"); *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 202–03 (4th Cir. 2013) ("The ordinary meaning of 'provide' is 'to make available' or to 'furnish.'") (citing *Random House Dictionary of the English Language* 1556 (2d ed. 1987)).

The Complaint plainly alleges that Active takes consumers' credit or debit card information, stores the financial data, and sends that payment information through the payments system. *See* FAC ¶¶ 27–31. And because there are at least two parties to every event registration transaction—the consumer who makes the payment and the organizer of the event who receives it (less Active's cut)—Active "provides" its payments processing services to *both* the event organizer *and* the organizer's customers (i.e., consumers). These allegations bring Active within the ambit of a "covered person."

**b.  The Complaint alleges facts sufficient to show that Active does not qualify for the merchant exception.**

Next, Active attempts to evade the CFPA's reach by invoking the merchant exception. Dkt. 28 at 9–10, 12–13. That exception excludes from the definition of "covered person" any:

> merchant, retailer, or seller of any nonfinancial good or service who engages in financial data processing by transmitting or storing payments data about a consumer *exclusively* for purpose of initiating payments instructions by the consumer to pay such person for the purchase of, or to complete a commercial transaction for, such nonfinancial good or service sold *directly* by such person to the consumer . . . .

12 U.S.C. § 5481(15)(A)(vii)(I) (emphasis added). Because, as alleged in the Complaint, Active does not process payments *exclusively* for the purpose of selling its own products—it processes them for purposes of registering consumers for events organized by third parties—it does not qualify for the merchant exception. FAC ¶¶ 1, 27–31.

Straining to fit within the exception's contours, Active characterizes its business as "selling event registrations" to consumers on behalf of event organizers. Dkt. 28 at 12. But Active cannot win a 12(b)(6) motion to dismiss by recharacterizing its business model in a manner that is inconsistent with the Complaint's allegations. The Complaint proffers that Active is a payments-processing middleman, facilitating *others'* (not Active's own) event registrations

by signing consumers up for events, processing their payments, and transmitting those funds (minus Active's fee) to the event organizers. FAC ¶¶ 1, 15–24, 27–31. The only plausible reading of the Complaint suggests that the only "merchant[s], retailer[s], or seller[s]" that could theoretically qualify for the merchant exception with respect to the event registrations are the event organizers, *not Active*. Active's claim that the Complaint "alleges" or "admits" that Active "sells" event registrations to consumers is simply false; the Complaint contains no such allegations or admissions, neither in the cited paragraphs nor anywhere else. *Compare* Dkt. 28 at 12 *with* FAC.

Nor does it matter that Active happens to sell one or more other products (such as its Advantage product) directly to consumers, since by Active's own admission, it does not process payments "exclusively" for that purpose. *See* Dkt. 28 at 12 ("Active sells event registrations . . . on behalf of event organizers to event participants"). Processing payments for goods and services sold by *others* (like Active does on behalf of event organizers) takes Active out of the exception's scope.

Active calls this plain reading of the statutory text an "expansive interpretation," Dkt. 28 at 10, and hyperbolically argues that it "would eviscerate the merchant exception, leading to a result where any merchant—from grocery stores to barbershops—could be regulated by the CFPB simply because the merchant accepts payment for goods and services," *id.* Of course, that is not so. Retailers that process payments exclusively to sell their own nonfinancial goods and services (like groceries and haircuts) directly to consumers are covered by the merchant exception for that activity. *See* 12 U.S.C. § 5481(15)(A)(vii)(I). Active, on the other hand, is nothing like a grocery store or a barbershop. As described in detail in the Complaint, its business

model is a far cry from simply accepting payment for its own goods and services—it gets paid a cut of each transaction it performs on behalf of an event organizer. FAC ¶¶ 1, 15–31.

Finally, Active wrongly asserts that "the CFPB does not and cannot allege that the Advantage program is offered to consumers 'in connection with' . . . Active's payment processing services." Dkt. 28 at 14. In fact, the Complaint does so allege. FAC ¶ 24 ("ACTIVE has marketed its discount club, Active Advantage, 'in connection with any transaction with a consumer for a consumer financial product or service' because ACTIVE sells memberships in Active Advantage by inserting its enrollment offer in the user flow of consumers registering for events online, while storing and transmitting payments."); FAC ¶ 65 (alleging that consumers were deceived into enrolling in Active Advantage "during and in connection with their online event registration and payment transactions"); FAC ¶¶ 73–76 (similar allegations with respect to abusiveness claim). Indeed, Active contradicts itself in its own brief, earlier stating, "the CFPB has also asserted that the Advantage program falls within the agency's enforcement jurisdiction because it is offered 'in connection' with financial products or services." Dkt. 28 at 2.

The Court should reject Active's spurious arguments that ignore and misstate the Bureau's well-pleaded factual allegations that Active is a covered person under the CFPA.

## 2. The Complaint plausibly pleads claims for violations of the CFPA.

Count One of the Bureau's Complaint plausibly alleges that Active engaged in deceptive acts or practices in violation of 12 U.S.C. §§ 5531(a) and 5536(a)(1)(B). A representation, omission, act, or practice is deceptive when: (1) "[it] is likely to mislead consumers acting reasonably under the circumstances, and (2) the representation, omission, act, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192 (9th Cir. 2016) (internal citation omitted).

The Bureau's Complaint plausibly pleads that a reasonable consumer would have been deceived by the way Active presented the Active Advantage offer. The Complaint alleges in detail that thousands of consumers requested cancellations, Active's chargeback rates far exceeded rates the major credit networks deem concerning, and 72 percent of consumers in 2019 told Active they were unaware of the membership. FAC ¶¶ 35–58. The Bureau is entitled to all favorable inferences that these facts support its claim of deception. *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). The alleged facts plausibly suggest that many consumers who registered for events via Active's website did not know they had agreed to purchase the Advantage product and did not want the Advantage product. FAC ¶¶ 51, 54, 57–59, Active may dispute that 72 percent of consumers were, in fact, unaware, or claim that 72 percent only represents the most "hapless" or "inattentive" consumers. Dkt. 28 at 17. But those factual disagreements do not support a 12(b)(6) motion to dismiss. *See Khan*, 2024 WL 3282097, at *3–4 (whether a reasonable consumer could be misled by the conduct is a matter of fact to be established at trial).

Count Two of the Bureau's Complaint also sufficiently pleads, in support of its abusiveness claim under 12 U.S.C. § 5531(d)(1), that Active materially interferes with consumers' ability to understand that they are enrolling in a fee-based membership. The Complaint states that Active consciously chose, based on marketing tests, certain language for its website to induce consumers to select the Advantage membership. FAC ¶¶ 43–44. The Complaint also alleges that Active rejected other words that were "more likely to alert consumers that they were signing up for a new and distinct product." FAC ¶ 44. The Complaint alleges that Active inserts the offer into the *middle* of the consumer's transaction—not after as Active claims, Dkt. 28 at 5—requiring the consumer to choose "Accept" or "No thanks" *before* Active presents

10

the transaction confirmation page. FAC ¶¶ 38, 45. And the Complaint also alleges that the transaction confirmation page does not confirm the Active Advantage membership at all, even for those consumers who clicked "Accept." FAC ¶ 46. The Complaint plausibly pleads that this conduct is both deceptive and abusive under the CFPA.

Active's motion improperly introduces new facts via selective insertion of cut-and-pasted sections of its website, taken out of context from the entire website and the order process in which they appear. Dkt. 28 at 18–20. Active's motion must be limited to the allegations on the face of the Complaint and cannot introduce new documents or evidence unless those documents are "referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

And in any event, Active's website excerpts are not properly authenticated, and the Bureau disagrees that they are an accurate representation of the Active Advantage website pages as actually seen by consumers. The Complaint alleges conduct over many years, but Active does not even state when the inserted sections were in effect. Website excerpts distort the real-life dynamics of interacting with multiple pages, often on a mobile device. They fail to show the relative font sizes, scroll bars, and ordering of so-called disclosure language. Even in *In re Vistaprint Corp.*, an unpublished opinion Active cites, the court considered entire website pages attached to the complaint, not cut-and-pasted sections. MDL No. 4:08-mn-1994, 2009 WL

2884727, at *4 (S.D. Tex. Aug. 31, 2009). The Court should reject Active's improper introduction of website excerpts in its motion.[5]

Active fails to proffer any cogent argument countering the Bureau's well-pleaded claims that Active engaged in deceptive and abusive acts and practices under the CFPA. Even if Active disputes the Complaint's facts regarding the presentation or ordering of the offer, factual disagreements at this early stage cannot support a dismissal under a 12(b)(6) standard.

**B.    Active cannot meet its burden to show that the Bureau's claims are barred by statutes of limitations.**

   **1.    The complaint's CFPA claims cannot be dismissed on statute of limitations grounds because Active's violations are ongoing.**

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003); *see also Frame v. City of Arlington*, 657 F.3d 215, 239–40 (5th Cir. 2011) ("[A] plaintiff is not required to allege that his claims were filed within the applicable statute of limitations.").

Far from showing that "the action is barred," the Complaint describes illegal conduct that is ongoing, and thus the Bureau's claims could not possibly be time-barred. *E.g.*, FAC ¶¶ 65–66 (alleging that, "[i]n numerous instances *since July 21, 2011*," FAC has made misleading misrepresentations and omissions) (emphasis added). Each time that Active, for example, misleads a consumer into enrolling in the fee-based discount club during a consumer's registration when the consumer thinks they are only signing up for a single event constitutes a discrete violation with its own statute of limitations. *See, e.g.*, 12 U.S.C. § 5561(5) (defining

---

[5] If the Court wants to consider evidence of Active's webpages in ruling on the motion, the Bureau requests an opportunity to conduct limited discovery to show how the offer was presented to consumers.

"violation" as "any act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law"); *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *20 (S.D.N.Y. Dec. 2, 2016) (explaining that "each [mis]representation would constitute a new and separate cause of action under the CFPA"). Because the Complaint indisputably describes violations within the limitations period, Active cannot meet its burden to show "from the plaintiff's pleadings that the action is barred." *Jones*, 339 F.3d at 366.

In *NDG Financial*, for example, the defendants similarly alleged that the complaint should be dismissed under 12(b)(6) because their conduct was outside the CFPA's statute of limitations. 2016 WL 7188792, at *19. But the court disagreed, finding instead that the Bureau's complaint plausibly alleged that the company "engaged in a continuing course of conduct" that included violations that fell well within the statute of limitations period. *Id.* at *20. The court in *NDG Financial* thus properly denied the motion to dismiss, as have numerous other courts faced with similar arguments. *See CFPB v. TransUnion*, 641 F. Supp. 3d 474, 481–82 (N.D. Ill. 2022) (rejecting statute-of-limitations argument raised on motion to dismiss because "[t]he complaint sufficiently alleges violations occurring within the limitations period (or at least does not establish that each violation occurred outside that period)"); *CFPB v. Howard*, No. 8:17-cv-00161, 2018 WL 4847015, at *2 (C.D. Cal. May 3, 2018) (noting that court had rejected statute of limitations argument raised in a motion to dismiss "because at least some of the alleged conduct occurred within the three-year statute of limitations period") (quotation marks omitted).

**2. In any case, Active cannot show that the statute of limitations expired because nothing in the Complaint indicates that the Bureau discovered the violations more than three years before filing the Complaint.**

Although the Court need go no further in order to reject Active's statute of limitations argument at this stage, that argument fails for an additional reason: nothing in the Complaint

establishes that the Bureau filed this lawsuit "more than three years after" discovering Active's violations.[6] *See* 12 U.S.C. § 5564(g)(1) (providing that "no action may be brought under this title more than three years after the date of discovery of the violation to which an action relates").

Active contends that this language refers not to the date that the Bureau actually discovers a violation but to the date that it *should have* discovered a violation. Dkt. 28 at 15. But that argument runs headlong into Fifth Circuit precedent holding that "a strict construction in favor of the government requires us to understand 'discovers' to require some degree of actual knowledge." *United States v. Ret. Servs. Grp.*, 302 F.3d 425, 433 (5th Cir. 2002).

It is also not what the statute says. Congress knows how to write statutes of limitations that incorporate a "should have known" standard. *See, e.g.*, 15 U.S.C. § 77m (barring actions "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence"); 21 U.S.C. § 335b(b)(3)(B) (barring actions initiated "more than 6 years after the date when facts material to the act are known or reasonably should have been known by the Secretary"). It chose to use different language in Section 5564(g)(1), and Active cannot rewrite the statutory text simply to try to avoid liability here.

As the court explained in rejecting a similar effort in *CFPB v. Chou Team Realty LLC*, "there is no 'constructive discovery' rule set forth in [Section 5564(g)(1)]—and [the defendant] has not shown that the Court is free to engraft one onto it, especially when the Supreme Court has cautioned against any such enlargement in construing such statutes against the government." No. 8:20-cv-00043, 2021 WL 4077110, at *5 (C.D. Cal. Aug. 10, 2021) (citing *Badaracco v.*

---

[6] The Bureau filed the original complaint initiating this lawsuit on October 18, 2022.

*Comm'r*, 464 U.S. 386, 391 (1984) ("Statutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.")), *aff'd*, 2022 WL 17958636 (9th Cir. Dec. 27, 2022).

In any event, the Court need not resolve this issue because the Complaint does not allege nor demonstrate that the Bureau discovered Active's CFPA violations before October 18, 2019, whether under the correct "actual discovery" standard or the "constructive discovery" standard that Active urges. Conspicuously lacking in any details, Active boldly asserts that "the CFPB had actual knowledge of the alleged facts giving rise to this action far earlier than the summer of 2019." Dkt. 28 at 15. Not only does Active's motion fail to point to any paragraph within "the four corners of [the Bureau's] pleadings," to support that claim, it points to no facts at all. *See Whiddon v. Chase Home Finance*, 666 F. Supp. 2d 681, 686 (E.D. Tex. 2009).

Active fares no better in demonstrating that the Complaint establishes that the Bureau had constructive knowledge of Active's violations before October 18, 2019. Even while improperly introducing extrinsic facts, Active fails to provide any explanation for its claim that the settlement of a California lawsuit, or a local newspaper's coverage of it, gave the Bureau constructive knowledge of violations of the CFPA alleged in the Complaint. Dkt. 28 at 15. Even if Active could demonstrate that the Bureau had knowledge of that lawsuit at the time it was settled, at most it would put the Bureau on notice of some facts relating to Active's deceptive business model under California state law. But the violations of the CFPA—which have a different legal standard—are not equivalent to state laws. And even then, Active does not state the date these claims accrued. Active has not shown that the Bureau had even constructive

knowledge of a violation of the CFPA prior to October 18, 2019. And Active's own case citations here are unpersuasive.[7]

### 3.  Active failed to meet its burden to show that the Bureau's EFTA claims in Count Three are time-barred.

EFTA does not have a one-year statute of limitations as applied to the Bureau. The one-year statute of limitations Active identifies to support its argument only applies in actions brought by consumers under 15 U.S.C. § 1693m. The relevant provision says that "any action under this section [i.e., § 1693m] may be brought . . . within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g).

But the Bureau does not bring claims under Section 1693m, which only pertains to private civil actions: a person who violates EFTA "with respect to any *consumer . . .* is liable to such *consumer . . . .*" 15 U.S.C. § 1693m(a) (emphasis added). The Bureau instead brings EFTA claims under Section 1693o (in Count Three), which does not impose a statute of limitations, and subtitle E of the CFPA (in Count Four).[8] Although Active points to the *ITT* case in support of its

---

[7] Active's reference to *CFPB v. Manseth* actually supports the Bureau's position. No. 22-CV-29-LJV, 2023 WL 5400235 (W.D.N.Y. Aug. 22, 2023); *see* Dkt. 28 at 15. Active selectively quotes from the case and fails to include the court's ultimate conclusion: that "the notion that mere receipt of a consumer complaint can trigger the statute of limitations against the CFPB is unsupported by any authority and would be unworkable." *Id.* at *18 (internal quotation omitted). Instead, "a credible and specific consumer complaint might *in some circumstances* serve as a storm warning," but this only puts the Bureau on "inquiry notice that it should begin investigating." *Id.* (internal quotation omitted). It does not, by itself, trigger the statute of limitations. *See id.* Nor does *NDG* help Active's position. *See CFPB v. NDG Fin. Corp.*, 2016 WL 7188792, at *19–20 (where the court's dicta suggesting a constructive discovery standard did not impact its ultimate ruling in the Bureau's favor and misreads the plain language of the statute).

[8] Section C.ii. of Active's motion does not appear to address the Complaint's CFPA violations under Count Four. *See* Dkt. 28 at 16. But to the extent Active alleges those are also time-barred, it cannot succeed. Because EFTA is a "Federal consumer financial law" under the CFPA, any violation of its provisions is also a separate violation of subtitle E of the CFPA, 12 U.S.C.

argument, that out-of-circuit case involved interpretation of the Truth in Lending Act, an entirely different statute with no application to this case. *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 922 (S.D. Ind. 2015) (imposing TILA's one-year statute of limitations on the Bureau's enforcement action). And regardless, other courts have disagreed with *ITT*'s analysis. *See, e.g.*, *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 48–49 (D.R.I. 2020) (finding that "much of the *ITT* court's reasoning is unconvincing.")

The Federal Trade Commission, which has concurrent enforcement authority over EFTA violations, has successfully brought claims under EFTA's Section 1693o in federal district court for years. *See, e.g.*, *F.T.C. v. Grant Connect, LLC*, 763 F.3d 1094, 1104 (9th Cir. 2014) (affirming individual liability for violations of EFTA); *F.T.C. v. Bunzai Media Group, Inc.*, CV-15-4527-GW (PLAx), 2015 WL 5305243, at *1–2 (C.D. Cal. Sept. 9, 2015) (granting preliminary injunction based on likely violations of EFTA, among others); *F.T.C. v. Triangle Media Corp.*, 18cv1388 BEN, NLS, 2018 WL 4051701, at *4–5 (S.D. Cal. Aug. 24, 2018) (granting preliminary injunction to prevent future violations of EFTA, among others). Active has not shown that EFTA's one-year statute of limitations regarding private civil actions applies to the Bureau's claims in Count Three.

**C.    The Bureau is validly funded, as the Supreme Court recently confirmed.**

As a last resort, Active claims this case must be dismissed because the Bureau is invalidly funded. But the Supreme Court just this term upheld the Bureau's method of funding in a 7-2 decision by Justice Thomas. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416

---

§ 5481(12)(C), (14). Therefore, the CFPA's three-year statute of limitations, beginning from the Bureau's discovery of the violation, applies to Active's CFPA violations under Count Four.

(2024) ("*CFSA*"); *see also CFSA v. CFPB*, 104 F.4th 930 (5th Cir. 2024) (on remand, "declaring that the Bureau's funding structure . . . is constitutional").

Undaunted, Active contends that a problem remains. By statute, the Bureau draws money from "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). Active appears to read the word "earnings" to refer only to that portion of the Federal Reserve's income that exceeds its expenses, payment of dividends, and deposits into the surplus funds maintained by each Federal Reserve Bank. *See id.* § 289(a)(1)–(2); Dkt. 28. at 22–23. These "net excess earnings," Dkt. 28 at 23, are transferred from the Reserve Banks to Treasury on a weekly basis, *see* 12 U.S.C. § 289(a)(3)(B). Recently, however, and due largely to the impact of changing interest rates resulting from the Federal Reserve's implementation of monetary policy, the Reserve Banks have not consistently generated net excess earnings and thus "[m]ost . . . suspended weekly remittances to the U.S. Treasury in September 2022." Press Release, Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024) (also noting that "certain Reserve Banks . . . [have] continued to remit excess earnings to the U.S. Treasury intermittently") (hereinafter, "FRB Press Release"), *available at* www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm. Active says this means the Bureau cannot validly draw and spend any money at this time.

Active is wrong. As an initial matter, Active's interpretation finds no support in the Supreme Court's ruling in *CFSA*. *Contra* Dkt. 28 at 22. The Court discussed the Federal Reserve's transfers to Treasury only to address the "threshold" question whether the Bureau's funding is even subject to the Appropriations Clause—which by its terms "applies to money 'drawn from the Treasury.'" *CFSA*, 601 U.S. at 425 (quoting Art. I, § 9, cl. 7). The Court

concluded that, whatever else the Clause may cover, it applies to "money otherwise destined for the general fund of the Treasury." *Id.* In so doing, the Court did not endorse the cramped and implausible interpretation of the term "earnings" that Active urges. It did not interpret that provision at all, which is hardly surprising given that the question presented did not encompass—and the parties did not address—the meaning of "earnings."

And even if Active were correct (and it is not) that the Court held that the Bureau can be funded only via money "otherwise destined for . . . the Treasury," that would not help it here. That's because the money the Federal Reserve System is currently spending (including to fund the Bureau) reduces future remittances to the Treasury—i.e., reflects funds otherwise destined for Treasury. *See* FRB Press Release (explaining that the Reserve Banks are currently accruing "deferred asset[s]" representing "the amount of net excess earnings these Reserve Banks will need to realize before their remittances . . . resume").

Active's reading fails as a matter of basic statutory interpretation. "A fundamental canon of statutory construction instructs that in the absence of a statutory definition, we give terms their ordinary meaning." *Schaeffler v. United States*, 889 F.3d 238, 243 (5th Cir. 2018). A common, everyday meaning of "earnings" is "money earned" or "income." *See* Earnings, *Black's Law Dictionary* (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets. *See* INCOME."); Earnings, *Oxford English Dictionary* (online ed. 2024) ("[T]he money made through working, trade or business activity, etc."; "The income produced by invested capital."). Applying that ordinary meaning here, the statute funds the Bureau from the income earned by the Federal Reserve System—not from whatever money is left over after accounting for all of the System's other expenses, dividends, and deposits into the surplus funds.

19

Although last year the Federal Reserve's "sum total of expenses exceeded estimated earnings," the Federal Reserve continues to generate many billions of dollars in earnings, much of it from "[i]nterest income on securities acquired through open market operations." FRB Press Release (reporting that income from this source alone "totaled $163.8 billion in 2023"). The statute authorizes the Bureau to draw and spend money derived from those earnings.

Active offers no support for its contrary interpretation beyond its misplaced reliance on *CFSA*. And, in fact, that interpretation is contradicted by all available evidence.

Start with ordinary meaning. Not even Active claims that its narrow and highly technical definition can be found in any dictionary or otherwise reflects the regular, everyday meaning of the term "earnings." True, stock-market investors often use that term to refer to a private company's "after-tax net income," rather than its gross income. *See* Earnings, Investopedia.com, www.investopedia.com/terms/e/earnings.asp. But that is not the definition Active urges here. It claims, for example, that "earnings" as used in Section 5497 are what is left over *after* the payment of (among other things) dividends to stockholders of the Reserve Banks. In the private-company context, however, earnings generally come before dividends. *See id.* ("Earnings . . . can be used to reward stockholders with dividends.").

Active's interpretation is also inconsistent with the Federal Reserve Act. Where that Act refers to "earnings," the term clearly bears its ordinary meaning of income or money earned. *See* 12 U.S.C. § 461(b)(12) (providing for the payment of "earnings" on balances maintained at a Federal Reserve Bank).[9] By contrast, the Act uses the term "net earnings" to describe the amount

---

[9] The term "earnings" is used the same way throughout the Dodd-Frank Act, which established the Bureau. *See* Pub. L. No. 111-203, § 210(n)(2) (directing the FDIC to deposit "interest and other *earnings* from investments" into Orderly Liquidation Fund) (codified at 12 U.S.C.

left after "all necessary expenses of a Federal reserve bank have been paid or provided for" (but before payment of dividends and deposits to the surplus funds). 12 U.S.C. § 289(a)(1)–(2); *see also id.* § 290 (directing how the Treasury Secretary may use whatever portion of "net earnings" are transferred to Treasury). What this shows is that Congress is fully capable of specifying particular amounts on the Federal Reserve's balance sheet when that is its intention and does not use the generic term "earnings" when it means something more specific.

Active's reading cannot be squared with the broader statutory context either. *See Abramski v. United States*, 573 U.S. 169, 179 n.6 (2014) ("[A] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (quotation marks omitted). Congress created the Bureau after the 2008 financial crisis to prevent future crises by ensuring that the federal consumer financial laws are adequately enforced. *See, e.g.*, 12 U.S.C. § 5511 (specifying purposes and objectives of the Bureau). By funding the Bureau as it did, Congress sought to provide "the assurance of adequate funding," which it deemed "absolutely essential" for the new agency. S. Rep. No. 111-176, at 163 (2010); *see also* 156 Cong. Rec. 13195 (2010) (statement of Sen. Dodd) ("The conference report requires the Federal Reserve System to *automatically fund* the CFPB. . . . This will ensure that the CFPB has the resources it needs to perform its functions . . . .") (emphasis added).

Giving the statutory language its ordinary meaning is consistent with this background because it ensures that the Bureau is adequately funded from the money generated by the Federal

---

§ 5390(n)(2)); § 806(c) (authorizing Reserve Banks to "pay *earnings* on balances maintained by or on behalf of" certain systemically important financial entities) (codified at 12 U.S.C. § 5465(c)); § 922(a) (requiring SEC to report "the amount of *earnings* on investments" made from its Investor Protection Fund) (codified at 15 U.S.C. § 78u-6(g)(5)(D)).

Reserve. By contrast, in Active's view, the Congress that created the Bureau set up the new agency so that it would be intermittently and unpredictably mothballed, potentially unable to carry out its statutory role overseeing the financial markets at precisely those times that economic disruptions were causing shortfalls at the Federal Reserve, and for the irrelevant reason of those shortfalls.[10] That is frankly not a plausible reading of the statute.

Active's interpretation would be unworkable to boot, and fails to account for how the Federal Reserve actually operates. Each of the 12 Reserve Banks separately remits its net excess earnings to Treasury each week. *See* FRB Press Release; 12 U.S.C. § 289. By statute, the Bureau draws money either annually or quarterly. 12 U.S.C. § 5497(a)(1). How, in Active's view, would a court determine the amount that the Bureau could validly draw in a given year or quarter? (Active claims, for example, that all money the Bureau has drawn "since the fall of 2022" is invalid, Dkt. 28 at 24, yet across 2022 as a whole, the Federal Reserve remitted billions of dollars to Treasury, *see* FRB Press Release.) And Active's reading would require courts to play auditor not only to the Federal Reserve but to the Bureau, since they would also need to somehow determine when the Bureau drew the particular moneys that it spent on a challenged agency action. These absurd consequences provide another reason, if any were needed, to reject Active's implausible attack on the funding mechanism that the Supreme Court so recently upheld.

---

[10] Such shortfalls would hardly have been inconceivable either—particularly in the immediate wake of the 2008 financial meltdown. *See* Gov't Accountability Off., *Federal Reserve System: The Surplus Account* 11 (Sept. 2002) (reporting that, from 1989 to 2001, "11 of the 12 Reserve Banks reported a total of 352 weeks in which earnings were less than expenses and losses"), *available at* www.gao.gov/assets/gao-02-939.pdf.

## IV. Conclusion

Because the Defendant has failed to show that there are any grounds to dismiss the

Bureau's well-pleaded Complaint, Active's motion to dismiss should be denied.

Dated:  July 15, 2024                          Respectfully Submitted,

                                               Consumer Financial Protection Bureau

                                               ERIC HALPERIN
                                               Enforcement Director

                                               RICHA S. DASGUPTA
                                               Deputy Enforcement Director

                                               KATHLEEN A. CONNOLLY
                                               Assistant Deputy Enforcement Director

                                               /s/ *Christopher D. Jackson*
                                               Christopher D. Jackson*
                                               Senior Litigation Counsel
                                               Virginia Bar No. 75027
                                               Telephone: 202-435-5240
                                               Email: christopher.jackson@cfpb.gov

                                               Lindsey M. Siegel*
                                               Senior Litigation Counsel
                                               Georgia Bar No. 730072
                                               Telephone: 202-407-0498
                                               Email: lindsey.siegel@cfpb.gov

                                               J. Khalid Hargrove*
                                               Senior Litigation Counsel
                                               DC Bar No. 989615
                                               Telephone: 202-595-4944
                                               Email: jimmy.hargrove@cfpb.gov

                                               1700 G Street, NW
                                               Washington, DC 20552

                                               *Attorneys for Plaintiff*
                                               *Consumer Financial Protection Bureau*

*Approved to appear *pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 15, 2024, I electronically filed Plaintiff's Opposition to Defendant's

Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will

automatically send email notification of such filing to all attorneys of record.

/s/ *Christopher D. Jackson*
Christopher D. Jackson