UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| CONSUKER FINANCIAL PROTECTION BUREAU, <br><br> Plaintiff, <br><br> vs. <br><br> ACTIVE NETWORK, LLC, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 4:22-cv-00898-ALM |

## REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

In defense of its regulatory overreach, the CFPB's Opposition to Active's Motion to Dismiss ("Opposition" or "Opp.") asks this Court to draw unwarranted inferences from the First Amended Complaint ("FAC") and disregard the express limits of the CFPA and the Constitution. The CFPB's unjustified power grab cannot be condoned and the FAC should be dismissed.

**A. The CFPB does not plausibly allege that Active is a covered person because the FAC alleges that Active is a merchant selling its own products.**

The CFPB accuses Active of disputing the facts alleged in the FAC. Opp. at 3-4. This misconstrues Active's motion. The problem is not that the CFPB's facts are incorrect (although some are). The problem is that the CFPB asks the Court to draw inferences in the CFPB's favor that find no support in the facts the CFPB has alleged. On the contrary, the CFPB's factual allegations support Active's position that it is exempt from regulation under the CFPA because they clearly demonstrate that Active fits under the merchant exception.

The FAC repeatedly alleges that Active sells event registrations and the Advantage product to consumers by marketing both products on Active's website. FAC ¶¶ 1-2 (alleging that consumers register and pay for events on Active's website and that during the registration process,

Active inserts a webpage that displays an offer for Advantage); *id.* ¶ 24 (alleging that Active markets "Advantage by inserting its enrollment offer in the user flow of consumers registering for events online [on Active's website]"); *id.* ¶ 32 (alleging that Active sells Active Advantage); *id.* ¶¶ 36-37 (alleging that consumers register and pay for events on Active's website).

Without denying these allegations, the CFPB spends the first portion of its opposition arguing that Active provides consumer financial products or services because Active processes payments. Opp. 5-7.[1] This argument is incomplete. Active's actual argument proceeds in two steps. First, the FAC does not allege any facts that demonstrate that Active marketed the Advantage product in connection with providing payment processing services to event organizers. Second, the FAC alleges that Active marketed the Advantage product only in connection with processing payments for selling its own products: Advantage and the event registrations. In arguing that it is not a covered person, Active asserts that neither the Advantage program nor the event registrations are consumer financial products or services, and that Active's payment processing in connection with these products cannot render it a covered person. Mot. at 7-9.

The CFPB implicitly agrees that Active cannot be a covered person if it sells the event registrations, because it next focuses its energy on convincing the Court that Active is not selling event registrations. In doing so, the CFPB strategically elides the allegations in the FAC to minimize how the FAC actually alleges the registrations are sold. According to the CFPB, the

---

[1] Relying on two out-of-circuit cases interpreting the term "provided" in other statutes, the CFPB claims that, by selling payment processing services to event organizers, who use it to process consumer payments, Active indirectly "provided" that same service to consumers. Opp. at 6 (citing *United States v. Manamela*, 612 F. App'x 151 (3d Cir. 2015); *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187 (4th Cir. 2013)). *Manamela* holds only that one may "provide" a service by performing activities integral to that service in the context of a conviction for health care fraud. 612 F. App'x at 153-55. *Lansdowne* merely instructs that in considering who is an "open video system provider," within the definition of the FCC's Exclusivity Order, one may "provide" a service even if it is not the "initial link" in a chain of service providers. 713 F.3d at 203. There is no need to consider whether the reasoning of either case is applicable here. The relevant question here is in what context Active processes payments.

2

FAC "proffers" that Active is a "middleman" that sells event registration services to event organizers, rather than selling event registrations directly to consumers, thereby rendering the merchant exception inapplicable. Opp. at 7-8. But this "middleman" allegation is not found in the FAC. Instead, the allegations claim that Active sells event registrations directly to consumers: consumers purchase events registrations on Active's website, which displays the event registration for a consumer to purchase, FAC ¶¶ 1-2, 24, 36-37; and Active collects payments for the event registrations, retains a portion of the payments, and remits a portion to event organizers. *See* FAC ¶¶ 20, 29-30. Having been contradicted by its own allegations, the FAC's "proffer" should therefore be rejected. The CFPB is not entitled to an inference that Active is not selling the event registrations when nothing in the FAC's factual allegations would support that conclusion.

The CFPB also argues that the merchant exception does not apply whenever a merchant processes payments for selling goods and services for others, such as event registrations sold on behalf of event organizers. Opp. at 8. This is a conclusion of the CPFB's own creation because the statute says nothing about the ownership of the product sold.[2] The exception applies to a merchant selling the products that it offers to consumers, 12 U.S.C. § 5481(15)(A)(vii)(I), and the FAC alleges that Active offers the event registrations for sale on Active's website. *See* FAC ¶¶ 1-2, 24, 36-37.

The CFPB also ignores that this interpretation would drastically narrow the merchant exception and fly in the face of Congress's intent, exposing ordinary retailers to CFPA enforcement merely because they sell another company's products. *See* 155 CONG. REC. H14762-

---

[2] To the extent the CFPB claims the merchant exception is ambiguous or somehow susceptible to its unilateral narrowing, the CFPB's interpretation is not entitled to deference. *Loper Bright Enters.v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."). The same is true for the CFPB's interpretation of its limitations period and its funding mechanism, *see infra* Parts C & E.

3

H14773 (daily ed. Dec. 11, 2009) (recognizing that Congress addressed the concern that the CFPA was too broad by expressly exempting "merchants" and "retailers": "Merchants, retailers, doctors, realtors, and others—some suggested the butcher, the baker, the candlestick maker—let's be clear, they're exempt from [Dodd-Frank] as was intended and as they should be.").

Accordingly, for these reasons, the FAC's claims should be dismissed because the CFPB does not allege facts plausibly showing that Active is a covered person.

### B. The CFPB's UDAAP claims rely on distortion and denial of publicly available facts that this Court may consider on a motion to dismiss.

The FAC alleges that the Advantage offer page is deceptive, but it does so while omitting the actual content of the webpage. Confronted with the offer page in the motion to dismiss, the CFPB deflects: it denies that the website content is accurate, without elaboration; decries the lack of proper authentication, again, without elaboration; and demands discovery related to the webpage. Opp. at 10-12.

Notably, the CFPB does not deny that it already obtained significant pre-complaint discovery related to the offer; the decision to omit any depiction of the offer was apparently a deliberate choice.[3] This is because the offer page contains extensive disclosures that cannot support a UDAAP claim. Mot. at 16-22. As the CFPB acknowledges, the Court may consider documents that are referenced in the FAC and are central to its claims. Opp. at 11. The CFPB cannot argue that the actual offer it claims is deceptive is not central to its claims. Accordingly, the Court may consider the visual representation of the offer described extensively in the FAC and need not rely on the FAC's vague, incomplete verbal descriptions. Mot. n.2.

---

[3] The CFPB acknowledges that other cases include the allegedly deceptive offer webpages in operative pleadings, thereby eliminating the need for the Court to guess about its contents. Opp. at 11-12 (noting that a court in another case "considered entire website pages attached to the complaint").

4

### C. The UDAAP claims' three-year limitations period has expired.

The CFPB argues that because it alleges ongoing violations, the limitations period on its UDAAP claims perpetually start anew, and that, because it is an agency, it may construe its authorizing statute to require actual knowledge to begin the limitations clock. Opp. at 12-16. The CFPB is wrong on both counts. The CFPB cites inapposite cases involving complex fact patterns and multiple UDAAP violations to support its position that it may escape the limitations period by alleging ongoing violations. *See, e.g.*, Opp. at 13 (citing, *inter alia*, *CFPB v. Howard*, No. 8:17-cv-00161, 2018 WL 4847015, at *1-2 (C.D. Cal. May 3, 2018) (involving multiple firms and individual defendants' collection of unlawful fees, misleading debt relief practices, and assisting violations of telemarketing rule); *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL7188792, at *1-3 (S.D.N.Y. Dec. 2, 2016) (alleging violations in origination, servicing, collection, and reporting from a payday loan scheme operated over nine different websites by twenty-one defendants)). Unlike the Active Advantage offer, the cases cited by the CFPB required discovery to assess the applicable statute of limitations for the multilayered fact patterns.[4] FAC at ¶¶ 1-5. But, where the allegations concern a single unlawful pattern of conduct, the Government has been held to a statute of limitations period beginning with the first discovery of the alleged conduct. *See United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502-03 (6th Cir. 1998) ("The Government cannot disregard its discovery of earlier occurring offenses in preference for later offenses which would produce a more favorable timeline."). The limitations period should end here after three years as Congress directs. *See Rotella v. Wood*, 528 US 549, 554-55 (2000)

---

[4] The CFPB has previously acknowledged, including in a case it relies upon in its Opposition, that conduct occurring prior to the three years statute of limitations would be time-barred. Opp at 13 (citing *Howard*, 2018 WL 4847015, at *2); *id.* (granting partial summary judgment in favor of defendant on all alleged conduct that occurred more than three years prior to the filing and recognizing that CFPB likewise agreed to limit its requested relief to the applicable period).

5

(recognizing rejection of rule that would extend "so beyond any limit that Congress could have contemplated" and thwart the objective of a limitations period (citation omitted)).

Likewise, there is no basis for the CFPB's assertion[5] that *only actual knowledge*, not the notice standard from the CFPA, can trigger the limitations period. In fact, the CFPA expressly states otherwise: the statute of limitation accrues when the CFPB "obtains *actual knowledge* of the facts giving rise to the action *or notice of the facts*, which *in the exercise of reasonable diligence, would have led to actual knowledge*." 12 U.S.C. § 5564(g)(1) (emphasis added). Here, the date of accrual runs from at least 2016 when notice of the facts giving rise to the Active Advantage offer were widely publicized in reporting on the California class action settlement. Mot. at 15; *SEC v. Fisher*, No. 07 C 4483, 2008 WL 2062699, at *3-5 (N.D. Ill. 2008) (finding accrual date from company's press release acknowledging allegations had been made); *see also id.* at *4 (recognizing the SEC's pre-litigation subpoena powers and investigatory advantage undermined its arguments that would extend the limitations period).

### D. The EFTA claim is time-barred under either EFTA's one-year statute of limitations or the CFPA's three-year statute of limitations.

Contrary to the express provisions of the CFPA and EFTA, the CFPB claims that it is entitled to an unlimited limitations period for enforcement actions under EFTA. Opp. at 16.

First, the CFPB is bound to EFTA's one-year statute of limitations, because the CFPA ties the CFPB's authority to the limitations contained in the consumer laws that it is charged with enforcing, including EFTA. 12 U.S.C. § 5564(g)(2)(B) ("In any action arising solely under an enumerated consumer law, the Bureau may commence . . . the action in accordance with the

---

[5] The CFPB cites *Badaracco v. Comm'r*, 464 U.S. 386, 391 (1984), in support of a generalized policy favoring the government's construction of its own limitations period. Opp. at 14-15. However, unlike here, in *Badaracco*, the authorizing statute expressly provided for the application of a three-year statute of limitations as well as an indefinite statute of limitations for enforcement actions. The CFPA does not provide for such an expansive period.

requirements of that provision of law, as applicable."); *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016) (rejecting CFPB's argument that it could ignore the statute of limitations found in RESPA because it was enforcing the statute via its administrative provisions), *vacated in part on other grounds on rehearing en banc*, 881 F.3d 75 (D.C. Cir 2018). EFTA's one-year limitations period applies and bars the claim here. FAC ¶ 49 (alleging last violation in January 2019).

Second, even accepting the CFPB's argument that Section 1693o governs its EFTA claim, the CFPB enforcement action would have a three-year limitations period. As recognized by the CFPB in prior litigation and by authorities it cites, the CFPA's three-year statute of limitations applies if the administrative enforcement provisions of a consumer statute are silent on the statute of limitations. Opp. at 17 (citing *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 48-49 (D.R.I. 2020) (adopting *the CFPB's position* that CFPA's limitations period would apply to CFPB's TILA claim)); *see also CFPB v. Ocwen Financial Corp.*, No. 17-80495, 2019 WL 13203853, at *26-28 (S.D. Fla. Sept. 5, 2019) (applying CFPA limitations period to CFPB action under FDCPA's administrative enforcement provisions). Under the most generous interpretation, the EFTA claim and those premised on an EFTA violation are subject to the CFPA's three-year limitations period.

**E. The CFPB's funding since fall of 2022 has been unconstitutional and *ultra vires*.**

The CFPB's funding is unlawful. The CFPA dictates that the CFPB's funds must be drawn from the "combined earnings of the Federal Reserve System," but the Federal Reserve System has generated no earnings since before September 2022. Opp. at 22; 12 U.S.C. § 5497(a)(1). The CFPB attempts to dodge this fact by suggesting that the Supreme Court's decision in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024) ("*CFSA*"), shields it from any funding-related attack. Opp. at 17-18. Not so. *CFSA* decided the constitutionality of the CFPB's novel funding "structure" wherein the agency is funded out of the Federal Reserve Board's combined

earnings. The Court did not consider the recent lack of earnings. *CFSA*, 601 U.S. at 421, 425. Further, the CFPB's tortured interpretation of *CFSA* ignores the Supreme Court's direction that "surplus funds" or profits destined for the Treasury, *not losses*, are the only legitimate source of funding under the CFPA. Opp. at 18-19 (citing *CFSA*, 601 U.S. at 425).

The CFPB proceeds down a rabbit hole of canons of construction and legislative intent to avoid this result, Opp. at 19-22, but its interpretation is irrelevant here where the meaning of "earnings" is apparent from the statute. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."). Regardless, the CFPB's proposed definitions of "earnings"—"money earned," "income," and "[r]evenue gained from labor or services"—are wrong. These definitions likely apply to an individual worker or household, and are not plausible in the context of the statute's provisions concerning government accounting. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." (citing *Brown v. Gardner*, 513 U.S. 115, 118 (1994))).[6] Instead, "earnings" in the context of funding a federal agency is "income minus expenses," "surplus" or "profits." *See Earnings,* Merriam-Webster, https://www.merriam-webster.com/dictionary/earnings (defining as "the balance of revenue after deduction of costs and expenses"); *Earnings*, Nasdaq Financial Terms Guide, NASDAQ, https://www.nasdaq.com/glossary/e/earnings (defining as "net income for the company during a period"); Charles J.

---

[6] Even if the meaning of "earnings" were ambiguous, the CFPB's interpretation would not be entitled to deference. *Loper Bright Enters.*, 144 S. Ct. at 2273.

Woelfel, "Earnings," Encyclopedia of Banking & Finance (10th ed. 1994) (defining as "Profits; net income").[7]

Indeed, the CFPB all but admits that it now is funded by the Federal Reserve System's debts, not earnings. Opp. at 19. The CFPB contends that its funding is "drawn from the Treasury" because the debts being incurred for its operation will reduce distant, future remittances to the Treasury. *Id.* But, these interpretive gymnastics would render meaningless the annual funding from "earnings," and replace it with a generic "funds" or "monies," removing one of the express restrictions Congress placed on the agency's funding. *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 485 (2012) (rejecting Government's interpretation that would render a provision "superfluous, void, or insignificant"). The CFPB's interpretations are flawed, its debt-based operation is contrary to law, and, therefore, all claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Active's motion to dismiss should be granted and the First Amended Complaint should be dismissed with prejudice.

---

[7] *See also* Hal Scott, *The CFPB's Pyrrhic Supreme Court Victory*, WALL ST. J. (May 20, 2024), https://www.wsj.com/articles/the-cfpb-pyrrhic-supreme-court-victory-federal-reserve-18099f59 ("This funding is supposed to come from Fed earnings, and unless the term 'earnings' is understood to mean revenue without regard to cost—a strained interpretation, even in government accounting—the CFPB would seem to have no valid claim now to any money from the Fed.").

Dated: July 29, 2024

Respectfully submitted,

/s/ *Clayton E. Bailey*
Clayton E. Bailey
Texas State Bar No. 00796151
cbailey@baileybrauer.com

**BAILEY BRAUER PLLC**
8350 N. Central Expressway, Ste 650
Dallas, Texas 75206
(214) 360-7424
Telephone: (214) 360-7433
Facsimile: (214) 360-7435

**VENABLE LLP**

Leonard L. Gordon (*pro hac vice*)
151 W 42nd Street
New York, New York 10036
(212) 307-5500
LLGordon@Venable.com

Benjamin E. Horowitz (*pro hac vice*)
600 Massachusetts Avenue NW
Washington, DC 20001
BEHorowitz@Venable.com

Elizabeth C. Rinehart (*pro hac vice*)
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400
ECRinehart@Venable.com

*Counsel for Defendant Active Network, LLC*

## CERTIFICATE OF SERVICE

    I hereby certify that on July 29, 2024, a copy of the foregoing was served on all parties through the Court's electronic filing system.

<em>/s/ Clayton E. Bailey</em>